STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 07-618

MARCUS RYAN

VERSUS

ZURICH AMERICAN INSURANCE COMPANY, ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2004-5691
HONORABLE R. RICHARD BRYANT, JR., DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and
Billy Howard Ezell, Judges.

Cooks, J., Concurs and assigns reasons.

**AFFIRMED AS AMENDED IN PART; REVERSED IN PART; AND
RENDERED.**

**Raleigh Newman**
**Attorney at Law**
**1830 Hodges Street**
**Lake Charles, LA 70601**
**(337) 439-5788**
**Counsel for Plaintiff/Appellant:**
**Marcus Ryan**

**Geraldine Fontenot-Roberts**
**Attorney at Law**
**450 Laurel Street, Suite 1701**
**Baton Rouge, LA 70801**
**(225) 382-5550**
**Counsel for Defendants/Appellees:**
**Zurich American Insurance Company**
**Custom Ecology, Inc.**
**Raymond Johnson**

**EZELL, JUDGE**.

Marcus Ryan appeals a jury's award of damages for past wage loss, loss of future earning capacity, pain and suffering, mental anguish, and loss of enjoyment of life. Mr. Ryan was injured when he was rear-ended by Raymond Johnson who was driving an eighteen-wheeler owned by Custom Ecology, Inc. and insured by Zurich American Insurance Company. He claims that he is entitled to an increase in the award of these damages as a result of the injuries sustained in the accident.

## FACTS

On October 15, 2003, Mr. Ryan was traveling home from Vinton Middle School where he was working for Lewing Construction Company, Inc. as a carpenter. He was stopped behind another vehicle when he noticed an eighteen-wheeler approaching behind him. Mr. Ryan realized that the eighteen-wheeler was going to hit him, so he braced himself for the impact. He had no pain immediately after the accident.

Mr. Ryan went to work, but he complained to his superintendent that he had headaches and his neck was hurting. After three to four hours of working, the company sent him home.

On October 20, 2003, Mr. Ryan went to see Dr. Damon Cormier, a chiropractor. At that time, Mr. Ryan's primary complaints were cervical pain which radiated into his right shoulder in addition to headaches. Dr. Cormier began treatment and last treated Mr. Ryan on December 29, 2003. Dr. Cormier released Mr. Ryan to return to work with no limitations. In doing so, Dr. Cormier wrote a letter to Mr. Ryan's attorney, explaining that he had released Mr. Ryan but that Mr. Ryan still had some soreness and stiffness. Dr. Cormier explained that carpenters generally want to return to work with no limitations. Mr. Ryan returned to work at Lewing

1

Construction in January 2004.

Continuing to experience problems, Mr. Ryan saw Dr. Clark Gunderson, an orthopedic surgeon, on March 31, 2004. Mr. Ryan reported to Dr. Gunderson that the pain in his neck was constant and that he had headaches once or twice a week. He also had back pain which did not radiate into the legs. The pain was made worse by daily activities. An MRI showed slight bulging in the neck. Dr. Gunderson referred Mr. Ryan to physical therapy. Dr. Gunderson testified that he thought Mr. Ryan was going to be okay and told him to continue working.

After several weeks, Mr. Ryan's back pain had disappeared but he continued to have neck pain. By June 29, 2004, the pain was moderately severe and constant in the neck and right shoulder and arm. Dr. Gunderson explained that he initially thought the pain was originating in the neck, but he decided to get an MRI of the shoulder on December 7, 2004. The MRI indicated an injury to the labrum, which is part of the lining of the shoulder that acts as a stabilizer to keep the shoulder in the joint as well as an attachment for the ligaments. Dr. Gunderson referred Mr. Ryan to Dr. David Drez, another orthopedic surgeon.

Dr. Drez saw Mr. Ryan on January 10, 2005. Initially, injections and therapy were administered. However, neither helped. On June 22, 2005, Dr. Drez performed an arthrosporic procedure to repair the tear in the labrum. Dr. Drez explained that Mr. Ryan did not do well after surgery. He had difficulty with the range of motion in his shoulder despite intense physical therapy. A second surgery became necessary to release the scar tissue and was performed on February 22, 2006. Dr. Drez last treated Mr. Ryan on August 25, 2006, at which time he found Mr. Ryan had reached maximum medical improvement.

2

During his treatment with Dr. Gunderson, Mr. Ryan developed numbness in his right hand. On January 25, 2005, Dr. Gunderson recommended an EMG, which was performed on February 17, 2005. The EMG indicated a moderately severe right carpal tunnel syndrome. Dr. Gunderson recommended a carpal tunnel release procedure which was performed on March 10, 2005.

Two days prior to the EMG, Mr. Ryan tested positive at work for marijuana. He received notice of termination from Lewing Construction on February 17, 2005. Since that time he has not worked for Lewing Construction.

Dr. Drez suggested that a functional capacity evaluation (FCE) would be beneficial to determine Mr. Ryan's physical limitations. Following his release from Dr. Drez, an FCE was performed on Mr. Ryan on September 7 and September 8, 2006. The FCE results indicated that Mr. Ryan could work but only at a light-duty level.

Following the carpal tunnel release procedure and the two shoulder surgeries, Mr. Ryan did not work. About a week before trial, Mr. Ryan began working as a security guard.

Trial was held before a jury on October 17 and 18, 2006. The jury returned a verdict finding that the accident had caused Mr. Ryan's injuries. He was awarded $72,000 in past medical expenses, $6,000 for loss of past wages, nothing for loss of future earning capacity, $24,000 for pain and suffering, $24,000 for mental anguish, and $24,000 for loss of enjoyment of life. Aside from the award for past medical expenses, Mr. Ryan appeals the other awards of damages, claiming them to be contrary to the law and evidence.

# LOST WAGES

## Loss of Past Wages

Mr. Ryan claims that the jury's award of $6,000 for loss of past wages is contrary to the law and evidence. He argues that all doctors agreed the he was unable to work from the date of the carpal tunnel surgery on March 10, 2005, to the date of trial because of his severe shoulder problem and surgeries, not because of a failed drug screen.

> Under Louisiana jurisprudence, damages for lost wages may be established by any proof which reasonably establishes the claim, including the plaintiff's own reasonable testimony. While claims for past lost wages must be established with some degree of certainty, they need not be proven with mathematical certainty, but only by such proof as reasonably establishes the plaintiff's claim. This award may be supported by the plaintiff's detailed and uncorroborated testimony.

*Smith v. Ebey*, 04-889, pp.6-7 (La.App. 3 Cir. 12/29/04), 896 So.2d 143, 148 (citations omitted).

At trial, Mr. Ryan admitted that he tested positive for marijuana in August 2002 while employed by Lewing. However, he was rehired by Lewing a month later. Prior to his shoulder surgery, Mr. Ryan tested positive again for marijuana in February 2005. He did not go back work for Lewing after this failed drug test.

Subsequent to his release from Lewing at this time, Mr. Ryan had the carpal tunnel release surgery in March 2005 and the two shoulder surgeries in June 2005 and February 2006. In August 2006, Dr. Drez found that Mr. Ryan had reached maximum medical improvement, and the FCE indicated that Mr. Ryan could return to work at a light-duty level.

Mr. Ralph Lewing, owner of Lewing Construction Company, testified on behalf of Mr. Ryan. Acknowledging that Mr. Ryan had been fired in February 2006

4

because he failed a drug test, Mr. Lewing testified that Mr. Ryan showed a lot of potential and he would have rehired Mr. Ryan as he had once before. Mr. Lewing then went on to explain that he could not hire someone with a permanent disability due to the nature of a carpenter's work. Chris Arceneaux, a superintendent with Lewing Construction, worked with Mr. Ryan prior to his automobile accident. Mr. Arceneaux testified that Mr. Ryan was a good worker.

Dr. Gunderson testified that when he first started treating Mr. Ryan, he found it hard to believe that Mr. Ryan wanted to continue to work given his shoulder problems. Dr. Gunderson testified that Mr. Ryan was unable to work for a while after the carpal tunnel release. He opined that Mr. Ryan could have returned to work in May 2005. However, the following month, the first shoulder procedure was performed on Mr. Ryan.

According to Dr. Drez, Mr. Ryan's shoulder condition was a lot better after the second surgery in February 2006. Dr. Drez stated that Mr. Ryan could not work when he was treating him. Dr. Drez released him from his care on August 25, 2006. While Dr. Drez opined that Mr. Ryan could return to his work as a carpenter, he testified that he would rely on the results of the FCE since it is based on objective data. He specifically testified that the FCE conclusions are more important than what he thinks. Manny Gala, the occupational therapist who performed the FCE, testified that Mr. Ryan gave a good effort during the testing.

The jury awarded Mr. Ryan $6,000 for loss of past wages. Each side presented evidence of the value of Mr. Ryan's wage loss. Kenneth Boudreaux, an economist, testified on behalf of the Defendant. Mr. Boudreaux did not believe that Mr. Ryan had suffered any past wage loss because he was terminated from his job. Obviously, the jury disagreed with this opinion since it did make an award for loss of past wages.

5

Mr. Boudreaux then went on to testify that "if Mr. Ryan was unable to work due to the accident after he was terminated in February of '05, and if there would have been a job for him to work but for an inability, physical inability caused by the accident, then I have no trouble that there is a past loss."

Dr. Charles Bettinger, and economist and statistician who testified on behalf of Mr. Ryan, calculated Mr. Ryan's loss of past wages from March 10, 2005 to October 16, 2006 at $61,429. This was based on $15 an hour that Mr. Ryan was earning at the time of the accident in addition to $3.50 an hour in fringe benefits and 6.2% for the employer's contribution to social security. Since Mr. Boudreaux did not make any calculations for loss of past wages, Mr. Boudreaux used the same information and calculated Mr. Ryan's wage loss at $60,622 at Plaintiff's counsel's request.

Defendants argue that the $6,000 awarded covered the time that Mr. Ryan initially did not work following the accident while he was seeking treatment with a chiropractor, a little less than three months. No evidence of the amount of wage loss during this time period was offered by either party.

Based on this evidence we find that the jury erred in awarding only $6,000 for loss of past wages. The jury found that Mr. Ryan's injuries were caused by the accident. The evidence clearly established that Mr. Ryan was unable to work following his surgeries even if he had not been terminated. We increase the award to $60,622 as the amount that is clearly established by the record as to Mr. Ryan's loss of past wages.

**Loss of Earning Capacity**

The jury failed to award any damages for loss of earning capacity. Mr. Ryan claims that this was in error as he is now relegated to light-duty work which effects

6

his future earning capacity.

> Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.

*Folse v. Fakouri*, 371 So.2d 1120, 1124 (La.1979); *See also, Carrier v. Nobel Ins. Co.*, 01-983 (La.App. 3 Cir. 2/6/02), 817 So.2d 126, *writs denied*, 02-728 (La. 5/10/02), 815 So. 2d 843; 02-739 (La. 5/10/02), 815 So. 2d 845.

At the time of the accident, Mr. Ryan was a member of the union and was working with Lewing Construction under a four-year apprenticeship program to become a journeyman carpenter. He was hired by Lewing Construction in November 2001 and was close to completing the apprenticeship before his surgeries. Mr. Ryan was earning $15 an hour. As a journeyman he would be entitled to rates of $17.97 an hour.

As previously stated, Dr. Drez testified that he would rely on the results of the FCE as to Mr. Ryan's limitations. Dr. Stanley Foster, an orthopedic surgeon who testified on behalf of the Defendants, agreed that Mr. Ryan could return back to work within the guidelines of the FCE.

No one disputes that Mr. Ryan would not be able to work as a carpenter now. Even though Mr. Lewing stated that he would have rehired Mr. Ryan, he testified that he could not hire someone with a permanent disability due to the nature of the work.

The Defendants presented the testimony of Karen Keller, a vocational rehabilitation counselor, to establish that Mr. Ryan was capable of returning to other employment earning at least as much, if not more, than he earned before. She was of the opinion that Mr. Ryan was capable of vocational retraining and returning to gainful employment earning $40,000 a year. The jobs she thought were appropriate

considerations included a computer assisted design drafter, an electronics technician, and a hot shot driver.

Admittedly, the first two suggestions would require retraining of two years. While these two jobs were light-duty, there was a math component to them. Testing established that Mr. Ryan was performing math at a seventh grade level. Glenn Hebert, the vocational rehabilitation counselor who testified on behalf of Mr. Ryan, testified that Mr. Ryan could not master the mathematical skills of a design drafter.

Ms. Keller explained that a hot shot driver is someone who usually runs items back and forth to oilfields and other areas. She testified that the research indicates that the drivers are not required to assist with loading and unloading but could offer no specific job description. Ms. Keller could not specifically indicate which of these jobs were actually available.

Mr. Hebert indicated that Mr. Ryan wanted a direct placement in a job because he had no funds to support his wife and three children. Mr. Hebert testified that he did not believe that Mr. Ryan could master the mathematical skills involved with the jobs listed by Ms. Keller. Mr. Hebert also stated that the hot shot driver was considered medium work with occasional climbing of stairs and ladders and scaffolding and would not fall into the limitations provided by the FCE. He further testified that hot shot driving did require loading and unloading at times. Mr. Hebert felt that the most Mr. Ryan could earn was $6.50 an hour up to $7.00 an hour given his limitations.

We find that the evidence clearly establishes that Mr. Ryan would have been rehired at Lewing Construction but for the injuries he suffered as a result of the accident. While there was evidence presented that he could seek employment in fields within his limitations that provide the same income, we find that the evidence

was not very realistic. For some of the jobs, Mr. Ryan would have to be retrained which means he would be out of work for at least another two years. Furthermore, we find it unreasonable to believe that he has the ability to be retrained in these fields given his learning ability. Due to Mr. Ryan's physical limitations, we also find that the other jobs listed by Ms. Keller were not feasible options. All doctors agreed that they would rely on the FCE as indicative of his physical abilities. The FCE specifically limited Mr. Ryan from any overhead activities or overreaching. He could not be in a position that required repetitive use of his right hand, and his endurance level was poor. We find that Mr. Ryan clearly established that his earning capacity was diminished as a result of the accident, and the jury erred in failing to award any damages.

Mr. Boudreaux found that Mr. Ryan would have suffered a loss of $647,470 if he could earn $7.00 an hour. This amount did not include any calculation for loss of fringe benefits or the employer's contribution to social security and assumed that Mr. Ryan had a work-life expectancy of 30.83 years as of the time of the accident. The amount of loss would be $783,170 if Mr. Ryan worked to age sixty-five.

Mr. Bettinger calculated Mr. Ryan's total wage loss at $1,249,727. This amount was based on a residual earning capacity of $7.00 an hour. Mr. Bettinger also assumed that Mr. Ryan would work to age sixty-five and used a real interest rate of two-and-a-half percent. This amount also included fringe benefits and the employer's contribution to social security which amounts to a total of $317,420. Additionally, $61,429 in loss of past wages is included. Adjusting the calculated amount since loss of past wages has already been discussed, the total amount of loss of future earning capacity as calculated by Mr. Bettinger is $1,188,298.

9

One of the biggest differences between Mr. Boudreaux's calculation and Mr. Bettinger's calculation is Mr. Bettinger's inclusion of fringe benefits and the employer's contribution to social security. Mr. Bettinger also used a higher percentage rate for Mr. Ryan's earnings to increase in accordance with the inflation rate.

Mr. Ryan's employment at the time of the accident provided fringe benefits, and his employer contributed to social security. There is no doubt that Mr. Lewing would have continued to employ Mr. Ryan. Right before trial, Mr. Ryan had secured a job as a security guard earning $5.50 an hour. He testified that he received no insurance or fringe benefits from this job. Mr. Ryan had consistently worked for Mr. Lewing and was a few months shy of journeyman status. Under the circumstances, we find the jury erred in failing to award damages to Mr. Ryan for loss of earning capacity. Based on the evidence in the record, we find that $1,188,298 is an appropriate award for loss of earning capacity.

## GENERAL DAMAGES

Mr. Ryan also appeals the award of general damages of $24,000 for pain and suffering, $24,000 for mental anguish, and $24,000 for loss of enjoyment of life. He claims that these awards are inadequate given the circumstances of this case.

The assessment of damages by a jury is a determination of fact. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). The role of an appellate court in reviewing an award of general damages is not to decide what it considers to be an appropriate award, but rather, to review the exercise of discretion by the trier of fact. *Id*. The adequacy of the award should be determined by facts or circumstances particular to the case under consideration. *Id*.

Reviewing the record, we do not find that the jury abused its discretion in the awards of general damages. We, therefore, affirm these awards.

For the reasons discussed, the award for loss of past earnings is increased to $60,622. Furthermore, we reverse the jury's failure to make an award for loss of earning capacity and award $1,188,298. In all other respects the judgment is affirmed. Costs of this appeal are assessed to the Defendants/Appellees.

**AFFIRMED AS AMENDED IN PART; REVERSED IN PART; AND RENDERED.**

**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**07-618**

**MARCUS RYAN**

**VERSUS**

**ZURICH AMERICAN INSURANCE COMPANY, ET AL.**

**COOKS, J., concurs.**

I concur in the majority's decision, but note that I would increase the awards for pain and suffering, mental anguish and loss of enjoyment of life.