988 So.2d 214 (2008)
Marcus RYAN
v.
ZURICH AMERICAN INSURANCE COMPANY, et al.
No. 2007-C-2312.
Supreme Court of Louisiana.
July 1, 2008.
Rehearing Denied August 29, 2008.
*215 Deutsch, Kerrigan & Stiles, Robert Emmett Kerrigan, Jr., Issac Harrington Ryan, New Orleans, The Law Office of Geraldine Fontenot-Roberts, Baton Rouge, Murphy Joseph Burke, III, for applicant.
The Law Offices of Raleigh Newman, Raleigh Newman, John Lee Hoffoss, Jr., Lake Charles, Donald Wayne McKnight, for respondent.
VICTORY, J.
We granted this writ application to determine whether the court of appeal correctly applied the appropriate standard of review in awarding the plaintiff $1,188,298.00 for loss of future earning capacity as a result of an automobile accident. After reviewing the record and the applicable law, we find that the court of appeal substituted its own judgment for the judgment of the trial court in violation of the manifest error rule; therefore, we reverse the judgment of the court of appeal awarding $1,118,298.00 for lost earning capacity and reinstate the jury verdict for that item of damages.

FACTS AND PROCEDURAL HISTORY
Marcus Ryan was injured on October 15, 2003, when the vehicle he was driving was *216 struck from behind by an 18 wheeler driven by Raymond Johnson, owned by Custom Ecology, Inc., and insured by Zurich American Insurance Company. Damage to Ryan's vehicle was minimal and Ryan was able to drive the vehicle home.
At the time of the accident, Ryan was employed by Lewing Construction Company as a carpenter. Ryan returned to work the next day, but was sent home after a few hours to seek medical attention. On October 20, 2003, Ryan sought treatment with Dr. Damon Cormier, a chiropractor, complaining of headaches and cervical pain which radiated into his right shoulder. On December 29, 2003, after ten weeks of treatment, Dr. Cormier released Ryan to return to work with no limitations, writing to Ryan's attorney as follows:
Mr. Ryan has been released from my care and may return to work as he is able to tolerate. He does still suffer from soreness and stiffness, however he should have no lasting problems and should be symptom free within six months. Please call me if you have any questions.
On his last day of treatment with Dr. Cormier, Ryan rated his pain on a scale of one to ten as a "one," with one being the lowest.
On January 4, 2004, Ryan returned to work at Lewing Construction as a framing carpenter for 13 months without incident, at a salary of $15.00 per hour plus benefits. During this time period, he began seeing Dr. Clark Gunderson, a Lake Charles orthopedic surgeon, reporting pain in his neck, shoulders, hand and lower back, and headaches. A MRI of his neck showed only slight bulging, so Dr. Gunderson told him he could continue to work and that he did not have a ruptured disk that required surgery. Dr. Gunderson referred Ryan to physical therapy and later testified that on each visit over the next nine months, he felt Ryan could continue working full-time as a carpenter, which Ryan continued to do. Although Dr. Gunderson initially thought Ryan's pain was originating in the neck, because his neck and shoulder pain did not improve, Dr. Gunderson ordered an MRI of the shoulder on December 7, 2004, which indicated an injury to the labrum.[1] Dr. Gunderson referred Ryan to Dr. David Drez, an orthopedic surgeon specializing in sports medicine, including shoulder problems.
On February 15, 2005, Ryan tested positive at work for marijuana. Accordingly, on February 17, 2005, he received notice of termination from Lewing Construction. This was the second time in three years he had failed a drug test at Lewing.
Also on February 17, 2005, an EMG of Ryan's right hand indicated a moderately severe right carpal tunnel syndrome. Dr. Gunderson performed a carpal tunnel release procedure on March 10, 2005. By May of 2005, he had made a good recovery from that surgery and Dr. Gunderson felt he could return to work as far as the carpal tunnel syndrome was concerned.
On June 22, 2005, Dr. Drez performed an arthroscopic procedure to repair the tear in the labrum of Ryan's right shoulder. Because Ryan had difficulty with range of motion following that surgery, a second surgery to release scar tissue was performed on February 22, 2006. Dr. Drez last treated Ryan on August 25, 2006, at which time he found Ryan had reached maximum medical improvement and could return to work as a carpenter. However, he recommended that Ryan undergo a functional capacity evaluation (a "FCE") to *217 objectively document what his limitations would be. The FCE concluded as follows:
Mr. Ryan at the present time is functioning at the light duty level, with the restrictions on any forward reaching or the overhead activities with the right shoulder. The repetitive movements of the right shoulder should be restricted. He is also complaining of the pain in the lower back during the forward bending motions. He is able to function at the low level work like using the hands at the desk which will not require the movements of the right shoulder.
Dr. Drez testified that he would defer to the results of the FCE to establish Ryan's physical limitations. In addition, Dr. Stan Foster, who conducted an IME at defendant's request, also testified that he would defer to the results of the FCE regarding Ryan's physical limitations. Following the FCE and about a week before trial, Ryan began working as a security guard at $5.50 per hour.
Trial was held before a jury on October 17 and 18, 2006, wherein liability was stipulated by the defendants, and the only issues were damages. After hearing the evidence, the jury returned the following damages:

Past medical expenses $ 72,000.00
Loss of past wages $ 56,000.00
Lost of future earning capacity $ -0-
Pain and suffering $ 24,000.00
Mental anguish $ 24,000.00
Loss of enjoyment of life $ 24,000.00
 ___________
 Total $150,000.00

On appeal, the Third Circuit upheld the jury's awards for pain and suffering, mental anguish, and loss of enjoyment of life. Ryan v. Zurich American Ins. Co., 07-618 (La.App. 3 Cir. 10/31/07), 970 So.2d 42. However, the Third Circuit increased the award of $6,000.00 for loss of past wages to $60,622.00, as the lowest reasonable amount that is supported by the record, and, after a de novo review of the record, awarded plaintiff $1,188.298.00 for loss of future earning capacity. Id. We granted the defendant's writ application, which assigns as error that the Third Circuit ignored appropriate standards of review and substituted its own judgment for that of the trier of fact in awarding plaintiff $1,188,298.00 for loss of future earning capacity. Ryan v. Zurich American Ins. Co., 07-2312 (La.3/14/08), 977 So.2d 919.[2]

DISCUSSION
At issue in this case is the appropriate standard of review where the trial court determined that the plaintiff's damages for loss of future earning capacity were "zero." Plaintiff contends that where the trier of fact does not reach the issue of the amount to award in damages, a de novo review should be conducted by the court of appeal. Defendant contends that the jury's determination of the amount, if any, of lost earning capacity is an issue of fact subject to the manifest error standard of review. Further, defendant argues that if the court finds manifest error in the jury's award, the standard of review requires that the reviewing court raise an inadequate award for earning capacity to the lowest amount the trial court could have awarded.
In asserting that a de novo standard of review is applicable in this case, plaintiff relies on LeBlanc v. Stevenson, 00-0157 (La.10/17/00), 770 So.2d 766 and Mart v. Hill, 505 So.2d 1120 (La.1987). In each of these cases, the jury found that the accident did not cause the damages at issue; therefore, the jury never reached the damage issue. The Court in LeBlanc held that *218 "[w]here a fact finder does not reach an issue because of an earlier finding which disposes of the case, the court of appeal, in reversing the earlier finding, must make a de novo determination of the undecided issues from the facts in the record" and that "[t]he reviewing court must make an award that is just and fair for the damages revealed by the record, where the trial court, as here, has made no award for damages." 770 So.2d at 771-72 (cites omitted).
In Mart, the fact finder awarded no damages for consequences of the accident beyond a certain date, finding that the plaintiff did not prove that his surgeries and disability beyond that date were causally related to the accident. After determining that this finding was clearly erroneous, the Court set out to determine the appropriate standard of review. At issue was whether the standard set out in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977) applied. In Coco, this Court held that when an appellate court finds that the lower court abused its vast discretion in awarding damages, the appellate court may only raise or lower the award to the highest (or lowest) point which is reasonably within the discretion of that court. In Mart, we held that "[t]he Coco principle of appellate review applies when an appellant questions the adequacy of a monetary award in a case which is otherwise uncomplicated by factual errors relating to the cause or duration of the plaintiff's disability." Mart, supra at 1128. Further, we held that "[t]he principles are not applicable when a res nova review of quantum must be made to compensate a plaintiff for damages which the trial court did not believe were causally related to the accident." Id. Accordingly, because the trial court found the damages sought were not causally related to the accident, the Court remanded the case to the court of appeal to conduct a de novo review of damages. Id. at 1129.
This case is distinguishable from LeBlanc and Mart because the trial court did not find that plaintiff's damages were not causally related to the accident. In fact, liability was stipulated and the only issue at trial was the amount of damages to be awarded. The jury awarded plaintiff several items of damages, but simply found that for loss of future earning capacity, the appropriate award was zero. This is not a case, like LeBlanc or Mart, where a determination of the amount of damages to be awarded for that item was foreclosed by a prior determination of lack of fault or causation.
Plaintiff also cites Green v. K-Mart, 03-2495 (La.5/25/04), 874 So.2d 838, for its assertion that de novo review is appropriate. In Green, the jury awarded special damages but failed to award general damages. In discussing the applicable standard of review, the Court held:
When, as here, the jury has awarded special damages but has declined to award general damages, the reviewing court must determine whether the jury's finding "is so inconsistent as to constitute an abuse of discretion." Wainwright [v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70] at 76. If so, only then can the reviewing court perform a de novo review of the record. Id.

874 So.2d at 843. This Court held that failing to make a general damage was an abuse of discretion where the jury determined that plaintiff suffered injuries causally related to the accident which required medical attention, and was still suffering an injury that would require medical attention in the future, and therefore affirmed the court of appeal's decision to award general damages in the amount of $500,000.00 Id. Accordingly, while Green *219 did not remand the case for a determination of damages as set out by the principles in Coco, neither Green, nor the other cases relied on by plaintiff, authorize an appellate court to reverse an award of damages absent manifest error by the trial court.
The jury's determination of the amount, if any, of an award of damages, including lost earning capacity, is a finding of fact. The Civil Code provides that "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." La. C.C. art. 2324.1. As we stated in Bonin v. Ferrellgas, 03-3024 (La.7/2/04), 877 So.2d 89, 94-95:
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error unless it is clearly wrong. Although we have spelled out the appropriate standard of review under the manifest error standard on numerous occasions, it bears repeating, because the court of appeal in this case improperly applied this standard. As this Court has recently stated, the manifest error/clearly wrong standard is "now well-established doctrine."
Under the manifest error standard, in order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. (Cites omitted.)
Accordingly, we agree with the defendant that the manifest error standard of review is appropriate here to determine whether the jury was clearly wrong in awarding no damages for loss of future earning capacity. If the jury was clearly wrong in awarding no damages for that item, then a reviewing court can only increase the award to the lowest amount which is reasonably within the court's discretion under the principles enunciated in Coco. See Hobgood v. Aucoin, 574 So.2d 344 (La.1990); Reck v. Stevens, 373 So.2d 498 (La.1979). Thus, we will first review the record to determine whether a reasonable factual basis does not exist for the trial court's finding and whether the record establishes that the jury was clearly wrong or manifestly erroneous.
We stated the law on loss of earning capacity in Folse v. Fakouri, 371 So.2d 1120, 1123-34 (La.1979) as follows:
What plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power. And while his earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury.
...
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
*220 The jury heard evidence in this case that plaintiff returned to work as a carpenter at Lewing Construction for 13 months after the accident in spite of his injuries and that it was only after he was fired for failing a drug test that he ceased working there. The jury also heard Dr. Cormier testify that he released plaintiff to return to work with no limitations on December 29, 2003. Plaintiff testified that he asked Dr. Cormier to give him an unlimited release because that was required for him to return to work, and that he had to work in spite of the pain. Plaintiff also presented the testimony of Mr. Lewing, who testified that plaintiff was a good worker and that he probably would have hired him back regardless of the fact that he failed the drug test. However, Lewing testified that if plaintiff had a permanent disability, he could not be rehired in his current position.
Dr. Gunderson also testified that on each visit over nine months, he felt Ryan could continue working full-time as a carpenter, which Ryan continued to do. In addition, Dr. Drez testified that after the second surgery, plaintiff was doing considerably better than when he first saw plaintiff, at which time plaintiff was still working for Lewing, that plaintiff had reached maximum medical improvement, and that in his opinion, plaintiff could then return to work as a carpenter. However, Dr. Drez testified that he would defer to the results of the FCE to determine plaintiff's true limitations.
As stated above, the FCE indicated that plaintiff could return to light duty work with certain restrictions. Plaintiff's prior job as a carpenter did not fit within that description. Accordingly, both sides presented expert testimony from two vocational rehabilitation experts to prove plaintiff's post-injury earning capacity. The evidence presented had established that plaintiff earned the following in the years leading up to the accident: 1999-$18,998; 2001-$16,964; 2002-$23,598; 2003-$22,176; 2004-$28,702. The record also established that plaintiff had obtained a GED in 2001 and was training in the carpenter's apprentice program at Sowela Tech at the time of the accident. Plaintiff had previously worked at fast-food jobs and for welding and oilfield companies.
The defendant presented the testimony of Karen Keller, who testified that plaintiff could earn as much or more than he did prior to the accident within the restrictions of the FCE. She testified that Ryan told her that when he worked for Lewing after the accident, he performed all the essential tasks of a carpenter on a full-time basis, which included "lifting, carrying and pushing and pulling, reached weights of up to 50 pounds on a regular basis, and up to a hundred pounds on an occasional basis." She testified that "he also was required to do some intermittent bending, squatting, stooping, and kneeling" and that "he had to climb ladders once or twice a day" and that "overhead and arms length reaching were required on a repetitive basis when performing carpentry tasks." She testified that pursuant to the restrictions of the FCE, he could be retrained as a CAD (computer assisted design) draftsman, which would require two years of vocational training. Ms. Keller stated that plaintiff's prior experiences were indicative that he could be vocationally retrained, stating:
Yes, my opinion is that he certainly is capable of vocational retraining, based on his scores, based on his demonstrated ability to complete an apprenticeship program and complete some vocational retraining. He's also, in my opinion, capable of returning to gainful employment; and, in fact, he's been released by his doctors, and both Dr. Drez and Dr. Gunderson have said that he's capable to *221 returning to gainful employment as per the restrictions of the FCE.
Ms. Keller testified that as a CAD draftsman, he could earn between $28,000 and $49,000 per year. She also testified that he could obtain employment without retraining as a "hot shot" driver in the Lake Charles area. A "hot shot" driver was described by her as light truck driving involving a pickup truck for deliveries. She testified that she had personally placed a middle-aged female with similar restrictions in employment as a "hot shot" driver and that the job did not require loading or unloading or any activities beyond the restrictions of the FCE. A "hot shot" driver earns between $700 to $1,000 per week.
Plaintiff's expert was Glenn Hebert who testified that, considering plaintiff's educational background and his physical limitations, his future earning capacity was $6.50 to $7.00 per hour. Mr. Hebert disagreed with Ms. Keller's assessment that plaintiff could be retrained as a CAD draftsman because of his deficiencies in mathematics, pointing out that he was performing at a 7th grade level in math. He presented the occupational requirements of a CAD draftsman from the Department of Labor which he argued showed that the mathematical requirements were well beyond the 7th grade level. However, Ms. Keller testified that the math requirements for a CAD draftsman were the same as for a carpenter. Mr. Hebert also testified that it was not feasible for plaintiff to be retrained because of financial difficulties.
Regarding the "hot shot" driver position, Mr. Hebert testified that the requirements for that position were "medium duty," and required loading and unloading, changing tires, and overhead lifting. Because these requirements were beyond the restrictions of the FCE, plaintiff would not be qualified for this position. According to Mr. Hebert, plaintiff "could do some dispatcher work, light delivery driver work, probably like work at Kinko's making copies, work in a movie theater, things of that nature."
After hearing the evidence, including the testimony of these two vocational rehabilitation counselors, the jury determined that plaintiff was not entitled to any damages for loss of earning capacity. Apparently, the jury credited the testimony of Ms. Keller over Mr. Hebert, and was evidently influenced by the fact that plaintiff worked as a carpenter for 13 months following the accident until he was fired for failing a drug test, and that his treating physicians felt he could return to work as a carpenter. In reversing the jury's finding, the court of appeal held:
We find that the evidence clearly establishes that Mr. Ryan would have been rehired at Lewing Construction but for the injuries he suffered as a result of the accident. While there was evidence presented that he could seek employment in fields within his limitations that provide the same income, we find that the evidence was not very realistic. For some of the jobs, Mr. Ryan would have to be retrained which means he would be out of work for at least another two years. Furthermore, we find it unreasonable to believe that he has the ability to be retrained in these fields given his learning ability. Due to Mr. Ryans's physical limitations, we also find that the other jobs listed by Ms. Keller were not feasible options. All doctors agreed that they would rely on the FCE as indicative of his physical abilities. The FCE specifically limited Mr. Ryan from any overhead activities or overreaching. He could not be in a position that required repetitive use of his right hand, and his endurance level was poor. We find that Mr. Ryan *222 clearly established that his earning capacity was diminished as a result of the accident, and the jury erred in failing to award any damages.
970 So.2d 47-48 (emphasis added).
"The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound." Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Systems of Calcasieu, Inc., 99-0201 (La.10/19/99), 748 So.2d 417, 421 (citing Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La. 1990)). "A fact finder may accept or reject the opinion expressed by an expert, in whole or in part." Green, supra (citing Lirette, supra). "The trier of fact may substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole." Id. (Citing Sportsman Store, supra). Upon review, "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." Sportsman Store, supra at 421. "But where such factors are not present, and a fact-finder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Id.
The court of appeal's opinion that Ms. Keller's suggested employment for plaintiff "was not very realistic" is not consistent with the manifest error standard as clearly, the court of appeal substituted its own judgment for the judgment of the trial court. The jury was free to credit Ms. Keller's testimony over Mr. Hebert's, and this was not a case in which "documents or objective evidence so contradict (Ms. Keller's) story" or where her testimony "itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story." In Ms. Keller's opinion, based on her personal experience and research, and based on Ryan's education and experience and the limitations of the FCE, Ryan could be employed as a hot-shot driver, or retrained as a CAD drafter, both at a higher salary than he was earning before the accident. No documentary or objective evidence so contradicted that testimony such that a reasonable fact finder could not credit it. Mr. Hebert simply disagreed and testified otherwise. As stated above, a jury may accept or reject the testimony of an expert in whole or in part, and apparently they rejected Mr. Hebert's testimony. Further, a jury "may substitute common sense and judgment for that of an expert when such substitution appears warranted on the record as a whole," and given the fact that plaintiff continued to work as a carpenter for 13 months following the accident until he was fired for failing a drug test, the jury certainly could have rejected Mr. Hebert's testimony that Ryan was physically unable to perform the jobs suggested by Ms. Keller. Accordingly, based on the evidence in the record, the jury's finding that plaintiff was not entitled to any damages for loss of earning capacity was supported by a reasonable factual basis. The court of appeal erred in rejecting the jury's decision based on its own credibility determinations regarding Ms. Keller's testimony, and in awarding damages for loss of earning capacity.

CONCLUSION
A jury's determination of the amount, if any, of lost earning capacity is an issue of fact subject to the manifest error standard *223 of review. It is only where the fact finder is precluded from considering the amount of damages because of an earlier finding that disposes of the case, such as lack of fault or causation, that the court of appeal should "conduct a de novo determination of the undecided issues from the facts in the record." LeBlanc, supra at 771. Here, the issue of the amount of damages to be awarded for loss of earning capacity was not "undecided" by the jury, the jury simply decided that based on the evidence, the appropriate award for that item of damages was zero. Therefore, the manifest error standard of review applies in this case. The court of appeal erred in not applying the manifest error standard, and instead substituting its judgment for that of the jury in increasing that award from zero to $1,118,298.00. The jury's determination was supported by a reasonable factual basis, particularly the expert testimony of Ms. Keller, whose testimony the jury credited over the testimony of Mr. Hebert. Questions of credibility are for the trier of fact, and the court of appeal was not at liberty to disregard these determinations based on its own opinion that "the evidence was not very realistic."

DECREE
For the reasons stated herein, the judgment of the court of appeal increasing the award for loss of earning capacity from zero to $1,118,298.00 is reversed and the jury's verdict for loss of earning capacity is reinstated. In all other respects, the judgment of the court of appeal is affirmed.
REVERSED IN PART AND AFFIRMED IN PART.
CALOGERO, C.J., concurs in part, dissents in part and assigns reasons.
KIMBALL, J. concurs in part, dissents in part and assigns reasons.
JOHNSON, J., dissents.
CALOGERO, Chief Justice, concurring in part and dissenting in part and assigning reasons.
I agree with most of Justice Kimball's reasons for concurring in part and dissenting in part. I am simply not prepared at this juncture to determine just what amount of damages for loss of earning capacity is adequately supported by the record.
KIMBALL, Justice, concurring in part, dissenting in part, and assigning reasons.
I concur with the majority that the manifest error standard of review is appropriate in this matter to determine whether the jury was clearly wrong in awarding no damages for plaintiff's loss of future earning capacity. However, I write separately to express my belief that the court of appeal was correct to find that the jury was, in fact, clearly wrong in this regard. There is simply no factual basis in the record upon which the jury could have reasonably found that the accident in which plaintiff was involved on October 15, 2003 did not negatively affect his earning capacity following that accident. See Stobart v. State, through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993).
The record reveals, specifically, that the jury heard evidence indicating that it was not until an MRI was administered on December 7, 2004, over one year after the accident in question, that plaintiff's shoulder injury was discovered. The jury then heard evidence indicating that this injury necessitated two surgeries in the course of the following fifteen months, and that plaintiff did not reach maximum medical improvement for this injury until August 25, 2006. Even at this point, the jury heard evidence, presented in plaintiff's functional capacity evaluation ("FCE"), *224 that plaintiff was only now "able to function at the low level work [sic] like using the hands at the desk which will not require the movements of the right shoulder."
The basic premise behind a loss of future earning capacity award "is that the injury done [to a plaintiff] has deprived him of a capacity he would have been entitled to enjoy...." Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979). At trial in this matter, it was never disputed that plaintiff had lost the capacity to return to work as a carpenter. While defendant's vocational rehabilitation expert, Karen Keller, testified that plaintiff might seek employment as a "hot shot" driver, or, with two years of vocational training, a computer assisted design ("CAD") draftsman, the fact remains that these job possibilities are inherently speculative. And though the majority insists that no documentary or objective evidence contradicts Ms. Keller's testimony, it is equally true that no such evidence was offered to support it. Indeed, it strains logic to suppose that plaintiff, who understands math at a seventh-grade level, could simply become a CAD draftsman instead of a carpenter.[1] By this rationale, plaintiff could take two years to retrain himself in any number of vocations (though, interestingly, Ms. Keller appears to have offered no advice on how plaintiff might earn a living in the meantime). Even if the jury's refusal to award any amount for plaintiff's loss of future earning capacity were based upon credibility determinations between plaintiff's and defendant's vocational experts, the court of appeal was right to find manifest error, as Ms. Keller's testimony was so "implausible on its face[] that a reasonable fact-finder would not credit the witness's story...." Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Systs. Of Calcasieu, Inc., 99-0201, pp. 6-7 (La.10/19/99), 748 So.2d 417, 421.
At bottom, all doctors involved in this trial agreed that they would rely on the FCE as indicative of plaintiff's physical abilities, and none disputed that plaintiff could not return to work as a carpenter. Thus, the evidence established that plaintiff has been deprived of his capacity to earn a living as a framing carpenter, and did not establish that he could earn that same living in another job. Accordingly, I agree with the court of appeal that plaintiff "clearly established that his earning capacity was diminished as a result of the accident, and the jury erred in failing to award any damages." Ryan v. Zurich Am. Ins. Co., 07-618, p. 9 (La.App. 3 Cir. 10/31/07), 970 So.2d 42, 48.
I note finally that, while I agree with the court of appeal that a loss of earning capacity was clearly diminished, I do not agree with the quantum of the court of appeal's award. As established in Coco v. Winston Industries, Inc., once it is determined that a trier of fact has clearly abused its discretion by awarding too little, an appellate court may raise that award only to the lowest point reasonably within its discretion. 341 So.2d 332, 335 (La. 1976). In the case sub judice, expert testimony *225 provided three particular award amounts to compensate for plaintiff's loss of future earning capacity, and the Court of Appeal decided to award the higher of the three.[2] A review of the evidence on record indicates that the lowest of the offered amounts, $647,470, as calculated for a 30.83 year work-life expectancy, is indeed a reasonable award.[3] Accordingly, I would affirm the Court of Appeal's decision awarding a loss of future earning capacity amount, but I would amend the judgment to reduce it to this lower, reasonable $647,470 award amount.
For the reasons stated herein, I respectfully concur in part and dissent in part.
NOTES
[1] The labrum is part of the lining of the shoulder that acts as a stabilizer to keep the shoulder in the joint as well as an attachment for the ligaments.
[2] Defendant does not assign as error the court of appeal's increase in the amount of damages for loss of past wages.
[1] It strains logic even further to suppose, as Ms. Keller testified at trial, that the math requirements for a CAD certified draftsman are the same as those for a carpenter working in plaintiff's previous capacity. Though I do not mean to disparage the job skills of carpenters, I note that the Department of Labor indicates that CAD draftsmen should have "knowledge of drafting standards, mathematics, science, and engineering technology ...," and further that [h]igh school courses in mathematics, science, computer technology, design, computer graphics, and, where available, drafting are useful for people considering drafting as a career." U.S. Dep't of Labor, Bureau of Labor Statistics, Occupational Outlook Handbook (2008-09 ed.).
[2] The Court of Appeal summarized the expert's calculations as follows:

Mr. Boudreaux found that [plaintiff] would have suffered a loss of $647,470 if he could earn $7.00 an hour. This amount did not include any calculation for loss of fringe benefits or the employer's contribution to social security and assumed that [plaintiff] had a work-life expectancy of 30.83 years as of the time of the accident. The amount of loss would be $783,170 if Mr. Ryan worked to age sixty-five.
Mr. Bettinger calculated [plaintiff's] total wage loss at $1,249,727. This amount was based on a residual earning capacity of $7.00 an hour. Mr. Bettinger also assumed that [plaintiff] would work to age sixty-five and used a real interest rate of two-and-a-half percent. This amount also included fringe benefits and the employer's contribution to social security which amounts to a total of $317,420. Additionally, $61,429 in loss of past wages is included. Adjusting the calculated amount since loss of past wages has already been discussed, the total amount of loss of future earning capacity as calculated by Mr. Bettinger is $1,188,298.
Ryan v. Zurich Am. Ins. Co., 07-618, p. 9 (La.App. 3 Cir. 10/31/07), 970 So.2d 42, 48.
[3] The Court of Appeal noted:

One of the biggest differences between Mr. Boudreaux's calculation and Mr. Bettinger's calculation is Mr. Bettinger's inclusion of fringe benefits and the employer's contribution to social security. Mr. Bettinger also used a higher percentage rate for [plaintiff's] earnings to increase in accordance with the inflation rate.
Ryan v. Zurich Am. Ins. Co., 07-618, p. 10 (La.App. 3 Cir. 10/31/07), 970 So.2d 42, 48. There is no indication within the record that, even working "light duty" for $7.00 an hour, plaintiff will be unable to secure a job that offers benefits and social security contribution. Further, there is no indication that use of a lower percentage rate to estimate the effects of inflation upon plaintiff's future earnings was unreasonable.