PARRO, J.
 

 This appeal involves a judgment in favor of Marshall Graham, who was injured in a fall on the deck of a dredge barge owned by Cashman Equipment Corporation (CEC), while working as a deckhand on a tugboat owned by his employer, Offshore Specialty Fabricators, Inc. (Offshore). A jury found CEC and Offshore were both at fault and Graham was con-tributorily negligent; it awarded Graham damages, but limited CEC’s liability to the value of the dredge barge, which was $160,000. Offshore and CEC appealed; Graham answered and cross-appealed. For the following reasons, we reverse in part and affirm in part.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 On September 16, 2008, Graham began working for Offshore as a deckhand on the tugboat, MEGAN E. DUPRE. Offshore had leased a large deck barge from CEC, and on the night of December 17, 2003, the MEGAN E. DUPRE was returning CEC’s deck barge at the expiration of the lease to a “barge fleet” on the Atchafalaya River near Morgan City.
 
 [1]
 
 CEC had a number of its vessels and other marine equipment stored at this location, including an old dredge barge, CONICAL,
 
 [2]
 
 which had been partially dismantled and was later sold for scrap. In order to tie up CEC’s deck barge at the designated location, two of CEC’s other barges and the CONICAL had to be moved, which required another Offshore tugboat, the E.H. DEMOUY, to assist the MEGAN E. DUPRE. Graham and Richard Craven, a deckhand from the E.H. DEMOUY, had to walk on the deck of the CONICAL, which was moored against the river bank, in order to untie its lines. Unknown to the two deckhands, the CONICAL had two large unmarked holes in its deck, one of which was hidden in shadows cast by spotlights from the two Offshore tugboats involved in the barge shifting procedure. Craven fell partially into one of these holes, and Graham also fell at the same location when he went to help Craven. As a result of their falls, both Graham and Craven were injured.
 

 Graham filed Jones Act and unseaworthiness claims against Offshore and general maritime negligence and unseaworthiness claims against CEC in the Sixteenth Judicial District Court (16th JDC),
 
 [3]
 
 claiming damages for injuries to his knee, neck, and lower back. A jury found that both defendants were liable and that Graham was contributorily negligent; it assigned 60% fault to CEC, 25% fault to Offshore, and 15% fault to Graham. It awarded Graham $200,000 in past physical and
 
 *1008
 
 mental pain and suffering, $25,000 for loss of enjoyment of life, $44,700 for past loss of income, and $125,000 for loss of future earning capacity.
 
 [4]
 
 Applying a federal maritime statute, CEC’s liability was limited to the value of the dredge barge, which was $160,000. A judgment incorporating the jury verdict was signed on June 15, 2007, and was amended by the court to correct a clerical error on June 21, 2007. In response to a motion for new trial and for amendment of the judgment, the judgment was again amended to correct other errors on August 31, 2007. CEC’s subsequent motion for new trial or judgment notwithstanding the verdict was denied. Offshore and CEC appealed; Graham answered the appeal and cross-appealed.
 

 Offshore assigns as error the jury’s determination that CEC was entitled to limitation of liability, alleging the CONICAL was no longer a “vessel” when the accident occurred, and even if it were, the limitation of liability was not appropriate, because CEC did not meet its burden of proving that it had no “privity or knowledge” of the condition that caused Graham’s injury. Offshore also appeals the amount of past lost wages and loss of future earning capacity awarded to Graham.
 

 CEC contends the jury’s answers to interrogatories were inconsistent; therefore, the court erred in denying its motion for new trial or judgment notwithstanding the verdict to correct the inconsistency. The alleged inconsistency is that the jury found CEC could limit its liability, which is only available if the jury found CEC had no “privity or knowledge” of the risk, and therefore, the jury’s finding of liability and allocation of fault to it is error. In the alternative, CEC asserts that it should not have been assessed any fault or that its fault should be fixed at less than 60%. CEC also appeals the amounts of the pain and suffering and loss of future earning capacity awards.
 

 Graham’s answer to the appeal seeks reversal of CEC’s limitation of liability, stating that the jury erroneously concluded that CEC lacked “privity or knowledge” of the hole in the deck of the CONICAL. He also alleges the CONICAL was not a vessel. In response to CEC, although Graham believes the jury erred in limiting CEC’s liability, he points out that the jury’s finding of no “privity or knowledge” does not interdict its finding of negligence on the part of CEC. He also argues that the general damage award is reasonable and that the evidence supports the awards for past lost wages and loss of future earning capacity.
 

 CEC responded to Offshore’s and Graham’s arguments that the CONICAL was no longer a vessel, asserting that this issue was not presented to the lower court in a pleading or at trial, nor was it raised when the jury instructions concerning limitation of liability were prepared. Therefore, CEC contends that the CONICAL’s status as a vessel is not properly before this court.
 

 APPLICABLE LAW
 

 Admiralty claims may be brought in federal court pursuant to its admiralty jurisdiction or in state court under the savings to suitors clause.
 
 See
 
 28 U.S.C. § 1333. In either case, federal substantive maritime law applies.
 
 Antill v. Public Grain Elevator of New Orleans, Inc.,
 
 577 So.2d 1039, 1040 (La.App. 4th Cir.),
 
 writ denied,
 
 581 So.2d 684 (La.1991). State appellate courts sitting in maritime
 
 *1009
 
 cases apply state standards of review.
 
 Winkler v. Coastal Towing, L.L.C.,
 
 01-0399 (La.App. 1st Cir.4/11/02), 823 So.2d 351, 356. Louisiana appellate courts apply the manifest error-clearly wrong standard of review of facts in general maritime and Jones Act cases.
 
 Terrebonne v. B & J Martin, Inc.,
 
 03-2658 (La.App. 1st Cir.10/29/04), 906 So.2d 431, 435. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trier of fact; and 2) whether the record further establishes that the finding is not manifestly erroneous.
 
 Mart v. Hill,
 
 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trier of fact’s finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factüal basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong.
 
 See Stobart v. State, through Dep’t of Transp. and Dev.,
 
 617 So.2d 880, 882 (La.1993). If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Trinh ex rel. Tran v. Dufrene Boats, Inc.,
 
 08-0824 (La.App. 1st Cir.1/22/09), 6 So.3d 830, 836,
 
 writs denied,
 
 09-0406 and 0411 (La.4/13/09), 5 So.3d 166,
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 228, 175 L.Ed.2d 128 (2009).
 

 Issues of negligence and causation in admiralty cases are treated as fact questions.
 
 Johnson v. Offshore Exp., Inc.,
 
 845 F.2d 1347, 1352 (5th Cir.1988),
 
 cert. denied,
 
 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). A court sitting in admiralty apportions damages in accordance with principles of comparative negligence.
 
 Vulcan Materials Co. v. Vulica Shipping Co., Ltd.,
 
 859 F.Supp. 242, 250 (W.D.La.1994).
 

 The Jones Act allows an injured seaman to bring a negligence suit against his employer. 46 U.S.C. § 30104(a).
 
 [5]
 
 The employer’s potential liability extends to all personal injuries arising during the course of the seaman’s employment, but proof of negligence is essential to recovery. Such negligence may arise in many ways, including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care.
 
 Zentner v. Seacor Marine, Inc.,
 
 06-2049 (La.App. 1st Cir.10/24/07), 977 So.2d 962, 965. The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely, the duty to take reasonable care under the circumstances.
 
 Gautreaux v. Scurlock Marine, Inc.,
 
 107 F.3d 331, 334-36 (5th Cir.1997). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries.
 
 Foster v. Destin Trading Corp.,
 
 96-0803 (La.5/30/97), 700 So.2d 199, 208. A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman’s employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard in a Jones Act negligence action becomes that of the
 
 *1010
 
 reasonable seaman in like circumstances.
 
 Gautreaux,
 
 107 F.3d at 339 (overruling jurisprudence stating the seaman has only a slight duty of care to protect himself from the negligence of his employer and attributing to the employer a higher duty of care than that required under ordinary negligence principles).
 

 The owner’s duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care.
 
 Johnson,
 
 845 F.2d at 1354. The ship owner’s exposure for unseaworthiness is a form of liability without fault, in that liability is imposed upon the vessel owner, whether the owner is the injured seaman’s employer or a third party, and without regard to his due care or negligence. It applies if the seaman’s injury was caused by a defective condition of the ship, its equipment, or appurtenances.
 
 Green v. Industrial Helicopters, Inc.,
 
 593 So.2d 634, 640 (La.1992). Unseaworthiness can also be manifested by an unsafe method of work, such as the failure by a ship owner to provide adequate equipment for the performance of an assigned task.
 
 Johnson,
 
 845 F.2d at 1354-55. This duty is non-delegable; it extends even to conditions of unseaworthiness created by third parties without any knowledge on the part of the owner.
 
 Foster,
 
 700 So.2d at 209 n. 5. To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the un-seaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.
 
 Johnson,
 
 845 F.2d at 1354. Under the general maritime law, a party’s negligence is actionable only if it is a “legal cause” of the plaintiffs injuries. Legal cause requires that the negligence be a “substantial factor” in the injury.
 
 Usé v. Usé,
 
 94-0972 (La.App. 1st Cir.4/7/95), 654 So.2d 1355, 1359,
 
 writs denied,
 
 95-1834 and 1879 (La.11/13/95), 662 So.2d 468. A plaintiffs own fault will proportionately reduce his recovery for injuries caused by negligence or unseaworthiness.
 
 See Foster,
 
 700 So.2d at 209.
 

 DISCUSSION
 

 Limitation of Liability
 

 A key factor in this ease is the Limitation of Liability Act, 46 U.S.C. §§ 30505-30513, and its application to the facts.
 
 [6]
 
 Section 30505 states, in pertinent part:
 

 (a) In general. — Except as provided in section 30506 of this title, the liability of the owner of a vessel for any claim, debt, or liability described in subsection
 

 (b) shall not exceed the value of the vessel and pending freight.
 

 *
 
 * *
 

 (b) Claims subject to limitation. — Unless otherwise excluded by law, claims, debts, and liabilities subject to limitation under subsection (a) are those arising from ... any act, matter, or thing, loss,
 
 *1011
 
 damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner.
 

 In a claim for personal injury or death, the privity or knowledge of the master or the owner’s superintendent or managing agent, at or before the beginning of each voyage, is imputed to the owner. 46 U.S.C. § 30506(e).
 

 In
 
 Brister v. A.W.I., Inc.,
 
 946 F.2d 350, 355-58 (5th Cir.1991), the Fifth Circuit discussed the application of these provisions, stating:
 

 In a limitation proceeding, once an injured seaman establishes that negligence or unseaworthiness caused his injuries, the burden shifts to the vessel owner to establish lack of privity or knowledge of the dangerous condition that caused the injury.
 

 [[Image here]]
 

 [A] corporate shipowner may be deemed to have constructive knowledge if the unseaworthy or negligent condition could have been discovered through the exercise of reasonable diligence.... The corporate owner, therefore,, must overcome a presumption not only that its officers and managers had actual knowledge, but also that they should have known of the unseaworthy or negligent condition that caused the injury.
 

 [[Image here]]
 

 Privity or knowledge does not necessarily require a showing of actual knowledge. It is deemed to exist if the shipowner has the means of obtaining knowledge, or if he would have obtained the knowledge by reasonable inspection. Knowledge is not only what the shipowner knows, but what he is charged with discovering, (citations omitted).
 

 We note first that the above statements negate CEC’s argument that the jury’s finding that its liability may be limited is inconsistent with the finding that it was negligent. As noted by the Fifth Circuit, even if negligence or unseaworthiness caused the injury, a vessel owner can still limit its liability if it can satisfy the statutory requirements. Therefore, we find no merit in CEC’s claims that the jury verdict was inconsistent on this issue or that the trial court erred in not granting it a new trial or judgment notwithstanding the verdict based on this argument.
 

 Graham and Offshore contend that the trial court erred in allowing CEC to limit its liability in this case, because the CONICAL was no longer a “vessel” when the accident occurred. With respect to this argument, we note that the issue of whether the CONICAL was a vessel was not raised until after trial in a post-trial memorandum. It was not raised in a pleading, and the trial court declined to address the issue. Appellate courts will not consider issues that were not raised in the pleadings, were not addressed by the trial court, or are raised for the first time on appeal.
 
 See Costello v. Hardy,
 
 03-1146 (La.1/21/04), 864 So.2d 129, 142 n. 13;
 
 Stewart v. Livingston Parish School Bd.,
 
 07-1881 (La.App. 1st Cir.5/2/08), 991 So.2d 469, 474; Uniform Rules of Louisiana Courts of Appeal, Rule 1-3. Therefore, this issue is not properly before us and we will not consider it.
 

 Graham and Offshore also argue that CEC did not satisfy its burden of proving a lack of privity or knowledge of the dangerous condition that caused Graham’s injury. Once the vessel owner’s liability has been established, the burden of proof shifts to the owner to prove that the liability was incurred without its privity or knowledge. Frank L. Maraist,
 
 Admiralty in a Nutshell
 
 318 (1996). If the claim is in
 
 *1012
 
 tort, privity or knowledge means the owner’s personal participation in the negligence or fault which caused the damage.
 
 Id.
 
 at 811. The difficulty arises when the shipowner is a corporation, which necessarily acts through its employees. “Generally speaking, courts will deny limitation of liability if the corporate fault which contributed to the damage was that of ‘high level managerial personnel,’ i.e., an officer or employee vested with discretion or authority with respect to the corporate activity which produced the damage.”
 
 Id.
 
 at 318. Moreover, “the corporate ‘high level managerial personnel’ probably will be charged with whatever they could have discovered in the exercise of reasonable care in supervising the vessel’s activities.”
 
 Id.
 
 at 314.
 

 CEC purchased the CONICAL from Cove Fleeting, a company owned by Lee Dragna. Dragna testified that before CEC bought the dredge barge, he walked the deck with its president and owner, James Michael Cashman. Before selling it to CEC, Dragna sent the dredge barge to another company to disassemble its crane and cut it up for scrap. During that process, two holes were left in the deck. The hole where the crane had been was 26 feet in diameter with a two-and-a-half-foot-high lip around its edge that had been the base of the crane. Another smaller hole at the other end of the deck, which Dragna described as about 16 inches wide and 36 inches long, had apparently resulted when “something very heavy hit it that was dropped on it” during the crane removal process. Dragna said this hole was not large enough for a man to fall into. He also said that he did not see or know about the smaller hole until after Graham’s accident, because the deck of the CONICAL was covered with debris when it was returned to his facility after the crane was removed. At some time before the accident, the CONICAL disappeared from its mooring at Dragna’s boatyard, and he thought it might have broken loose. He called CEC’s offices, and they claimed to know nothing about the moving of the dredge barge. One of Dragna’s employees later saw the CONICAL’s spuds “sticking up over the levee” where CEC’s barge fleet was located, so Dragna paid no further attention to it. After Graham’s accident, the CONICAL was returned to Dragna’s company and, at CEC’s instruction, a piece of plate was placed over the smaller hole and welded in place.
 

 Mr. Cashman testified that he did not remember walking the deck of the CONICAL before buying it from Cove Fleeting, but stated that he generally does conduct an “eyeball” inspection before making a purchase. His company had no inspection policy for this type of vessel. He viewed the vessel from the bank before the crane was removed. At that time, he did not see any holes in the deck and, in fact, did not realize until the day of trial that Graham had fallen as a result of a hole in the deck, rather than an open hatch, as he had assumed. He did not recall seeing the CONICAL after buying it, and had no idea how or by whom the dredge barge was moved from Cove Fleeting’s facility to the barge fleet. Mr. Cashman said his company contracted with a fleeting company, River-Land, to manage the barge fleet.
 
 [7]
 
 Mr. Cashman did not recall instructing any of his employees to inspect the condition of the CONICAL after he bought it, and did not know if either of his two employees who dealt with barge operations on a daily basis, L.J. Pontiff or Brian Jones, knew
 
 *1013
 
 anything about this particular dredge barge. His intention was to turn the CONICAL into a deck barge, and he knew that the crane had been removed from the deck and cut up. CEC eventually sold the CONICAL for scrap to another company owned by Mr. Cashman.
 

 Levan J. Pontiff testified that in 2003, he was CEC’s operations manager, which involved the operations of ABS-class barges that CEC leased or chartered out to other parties. He had no duties or authority with respect to the CONICAL, because it was not an operating vessel or ABS-class barge. In fact, he said that as far as he knew, no one in the company was running the “unclassed” barges or taking care of them. He first saw the CONICAL at Cove Fleeting; at that time, he did not know CEC owned it and did not see any holes other than the large hole where the crane had been. He said he suggested to Dragna that the large hole was a safety hazard and should have something over or around it. Pontiff said he was unaware that CEC had purchased the CONICAL until he was notified of the accident. After the accident, he went to the barge fleet location and saw a tear in the CONICAL’s deck about 20 feet away from the large hole where the crane had been. He described this smaller hole as five to six feet in length and three feet wide at one end, narrowing to 18-24 inches at the other end. The material of the deck was pushed down on an angle where it was actually torn. According to Pontiff, the hole was definitely large enough for a man to fall through. The day-to-day management of the barge fleet was handled by Dragna or Riverland; Pontiff said he had nothing to do with moving the dredge from Cove Fleeting to the barge fleet. He acknowledged that with respect to the equipment in the barge fleet, the equipment owner would have the authority over the conditions of that equipment, not the fleeting company. Pontiff also said that it was not unusual for tugboat deckhands to get onto the equipment in the fleet in order to shift equipment and moor a barge in a particular location. In fact, more likely than not, when a piece of equipment was in the barge fleet, people would be walking on it at some time or another. He also testified that he and Mr. Cashman regularly received a computerized list and physical diagram from RiverLand, showing all the vessels tied up in the barge fleet and their locations.
 

 Based on this evidence, we conclude that the jury erred in finding that CEC had no privity or knowledge of the dangerous condition on the deck of the CONICAL that caused Graham’s accident. Mr. Cashman was the owner and president of the company, so his knowledge is imputable to the corporation, as is Pontiffs knowledge, since he was its operations manager. According to his own testimony, Mr. Cashman did not view the CONICAL after he purchased it for his company, nor did he assign responsibility for the vessel to any of his employees. His comments indicate that he just bought it and forgot it. Pontiff indicated that to his knowledge, no one in the company was charged with taking care of this vessel, although he knew that it was very likely that any vessel tied up at the barge fleet would be walked on during shifting or mooring procedures. RiverLand’s printouts should have brought to his and Mr. Cashman’s attention the fact that the CONICAL was located at the barge fleet. The evidence establishes that the CONICAL had two major defects in its deck that were unmarked and unbarricaded, and one of these defective conditions directly caused the fall in which Graham was injured. As the owner of the barge, CEC had a responsibility to inspect it after purchase and to take appropriate steps to barricade the
 
 *1014
 
 area and to warn others of the existence of the holes in the deck. Although the evidence did not establish that anyone in CEC’s employ had actual knowledge of this particular condition before the accident, privity or knowledge does not require a showing of actual knowledge. In this case, CEC’s lack of knowledge is attributable to CEC’s failure to exercise reasonable diligence — or any oversight at all — after buying, the CONICAL. The hole in the deck where Graham fell was large and obvious in the daylight, and could have been discovered through a simple “eyeball” inspection. Moreover, CEC produced no evidence of any inspection policy with respect to any “unclassed” vessels in its fleet. In fact, Mr. CEC indicated that the company had no inspection policy for this type of vessel. Limitation of liability is not available to a vessel owner who takes a “hands-off” approach and totally fails to evaluate a vessel’s seaworthiness or to take other steps to address potential safety issues.
 
 See Trico Marine Assets Inc. v. Diamond B Marine Services Inc.,
 
 382 F.3d 779, 790 (5th Cir.2003). CEC failed to carry its burden of proving its lack of privity or knowledge in this case. Therefore, we conclude the jury erred in finding that CEC did not have privity or knowledge, and thus allowing CEC to limit its liability to the value of the CONICAL.
 

 Allocation of Fault
 

 CEC claims the jury erred in assigning any fault to it. We disagree. The vessel owner has a duty to take reasonable care to ensure that its vessel is fit for its intended use and is free from hazardous conditions that might cause injury to those on board. It is clear from the testimony of CEC’s president that he knew that the crane on the deck of the CONICAL was being removed in order to turn the vessel into a deck barge, and that as a result of this, the deck of the vessel would no longer be intact. In fact, the deck had two large holes in it as a result of the crane removal process. These holes were open and obvious and could have been discovered with a cursory inspection. Yet, CEC took no steps to inspect the vessel after purchasing it or after the crane had been removed, had no inspection policy for this type of vessel, did not assign responsibility for the CONICAL to any of its employees, and did nothing to barricade or mark the large hole where the crane had been removed or the other hole in the deck where Graham fell. The hole in the deck was a substantial factor in Graham’s injury. Accordingly, we conclude that the jury did not err in assigning fault to CEC.
 

 CEC also argues that the jury erred in assigning 60% fault to it. The jury assigned 25% fault to Offshore and 15% fault to Graham. In apportioning fault, the court considers the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
 
 Gibson v. State, through Dep’t of Transp. and Dev.,
 
 95-1418 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1005,
 
 writs denied,
 
 96-1862, 1895, and 1902 (La.10/25/96), 681 So.2d 373 and 374. The factors to be considered include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacity of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.
 
 Dennis v. The Finish Line, Inc.,
 
 99-1413 (La.App. 1st Cir.12/22/00), 781 So.2d 12, 27,
 
 writ denied,
 
 01-0214 (La.3/16/01), 787 So.2d 319.
 

 
 *1015
 
 With respect to Graham’s negligence, the evidence reveals that he went aboard the CONICAL at night without carrying a flashlight or using a headlamp. There were no lights on shore or on the barges. The deck of the CONICAL was not fully visible in the floodlights and spotlights of the tugboats, and portions of the deck were in deep shadow. Additionally, the deck was littered with debris. Captain Ronnie D. Graham, who was piloting the E.H. DEMOUY for Offshore that night, confirmed that when Craven fell, Captain Graham could not see the hole or Craven’s body on the deck, because that area was in the shadows. Under these conditions, Graham was negligent in attempting to walk across the deck of an unfamiliar vessel without some lighting mechanism. In fact, he admitted that he was “messing up” by not having a light. However, with respect to Offshore’s negligence, Graham testified that there were no flashlights available on the MEGAN E. DUPRE for him to use. He said that the only flashlight he knew about was in the engine room on the boat, and it could not be removed from there. Thomas Tamplain, Offshore’s port captain at the time, said Offshore did supply flashlights for its tugs, and although there were no rules concerning the use of flashlights, their use was “probably in the common sense manual.” Craven testified that he had a headlamp, but that it was his personal equipment. He said Offshore did not provide any headlamps on the E.H. DEMOUY. His headlamp had burned out while they were securing the barges, and he did not have a replacement bulb. Craven also stated that the deckhands were usually told if there were open manholes or other safety problems on the decks of barges, but they had not been told about any holes on the deck of the CONICAL. Captain Graham admitted that he took no steps to ascertain the actual condition of the dredge barge CONICAL or the other two barges before sending Offshore’s deckhands onto them in poor lighting conditions at night. He simply warned them to be careful out there.
 

 The negligence of Offshore and Graham, which primarily involves lighting inadequacies and simple carelessness, is far overshadowed by that of CEC, in leaving two large, uncovered holes in the deck of the CONICAL and not warning anyone of their existence. Therefore, we cannot say that the jury’s allocation of 60% fault to CEC was manifestly erroneous.
 

 Past Lost Wages and Loss of Future Earning Capacity
 

 Offshore contests the amount of past lost wages and loss of future earning capacity awards to Graham. CEC also appeals the amount of the loss of future earning capacity award.
 

 A plaintiff seeking damages for past lost wages bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident.
 
 Boyette v. United Services Auto. Assn.,
 
 00-1918 (La.4/3/01), 783 So.2d 1276, 1279. The trier of fact has broad discretion in assessing awards for lost wages, but there must be a factual basis in the record for the award.
 
 Driscoll v. Stucker,
 
 04-0589 (La.1/19/05), 893 So.2d 32, 53. A trial court’s award for lost wages is subject to the manifest error standard of review because such damages must be proven with reasonable certainty.
 
 Boudreaux v. State, Dep’t of Transp. and Dev.,
 
 04—0985 (La.App. 1st Cir.6/10/05), 906 So.2d 695, 705,
 
 writs denied,
 
 05-2164 (La.2/10/06), 924 So.2d 174, and 05-2242 (La.2/17/06), 924 So.2d 1018.
 

 The jury’s determination of the amount, if any, of an award of damages, including lost earning capacity, is a finding of fact.
 
 Ryan v. Zurich American Ins.
 
 
 *1016
 

 Co.,
 
 07-2312 (La.7/1/08), 988 So.2d 214, 219. However, unlike awards for past lost earnings, awards for lost future income or loss of future earning capacity are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Therefore, the jury is given much discretion in fixing these awards. LSA-C.C. art. 2324.1;
 
 Dennis,
 
 781 So.2d at 40. An award of loss of future income is not based upon the difference between a plaintiff’s earnings before and after a disabling injury. Rather, the award is predicated upon the difference between a plaintiffs earning capacity before and after a disabling injury.
 
 Dennis,
 
 781 So.2d at 40. Damages may be assessed for the deprivation of what the injured plaintiff could have earned, despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
 
 Ryan,
 
 988 So.2d at 219. Additionally, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.
 
 Lirette v. State Farm Ins. Co.,
 
 563 So.2d 850, 853 (La.1990).
 

 The record shows that at the time of his accident, Graham had been working as a deckhand for Offshore since September 16, 2003. He had satisfactorily completed a 90-day probationary period, had received a pay raise from $110 per day to $120 per day, and had become eligible for employee benefits. His work schedule was 14 days on and 7 days off. Graham testified that he hurt his left ankle, right knee, and lower back when he fell. Although he initially felt that his injuries were not serious, within days he realized that he was not getting any better and that he “wasn’t able to pull on no three inch rope.” He first saw a doctor on January 7, 2004, and from that day on, he obtained regular medical treatment, medications, and physical therapy for the pain in his knee and back. On May 11, 2005, he had an anterior lumbar fusion and disc replacement surgery. According to Graham and his wife, Cindy, he had not been able to work a full day since the accident. But as of August 2006, he was doing some part-time yard cleanup and bush hogging for $10 per hour.
 

 The orthopedic surgeon who performed Graham’s surgery, Dr. Kenneth Adatto, assigned a 10-15% impairment to his lumbar and cervical spine and also assigned work restrictions, including minimal stooping and bending, minimal prolonged standing or sitting for greater than 45 minutes, no repetitive lifting over 10-20 pounds, no repetitive looking up or down, and no work above shoulder level. According to a vocational rehabilitation evaluation prepared by Nathaniel Fentress, Graham had an eighth-grade education, but functioned at a lower level on academic skills tests. His previous employment was as a truck driver, deckhand, construction worker, bulldozer operator, auto mechanic, boilermaker helper, and scaffold builder. Fentress concluded that Graham was totally medically and vocationally disabled from returning to any of his previous occupations. He suggested that Graham’s residual earning capacity ranged from a total loss of earning capacity upwards to approximately $8.00 per hour.
 

 Economist Randolph Rice, Ph.D., computed Graham’s annual pre-accident gross income as a deckhand for Offshore would have been $29,200. After deducting for federal and state income taxes, he concluded that the wages Graham would have received from the date of his accident in December 2003 until August 2005 (the date of his report) were $44,378. From that
 
 *1017
 
 date, Rice carried the annual income figure forward for each year of Graham’s subsequent work-life expectancy, and after applying. a conservative discount rate, concluded that the total discounted present value of his future after-tax earning capacity loss was $227,473. However, if Graham could secure year-round employment at minimum wage, he could earn $88,055, leaving his net future discounted wage loss as $139,418. Another economist,' Hugh Long, Ph.D., computed that Graham’s future economic loss of his employment based health, dental, disability, and life insurance benefits was valued at $129,744.
 

 The evidence also included Graham’s admission that he had not filed federal tax returns in at least ten years, because he was not making enough to have to file, and that his Social Security earnings record showed that for 22 of the 30 years shown, he had reported income of less than $1000 per year. On three income tax returns that he had recently filed, his earnings were shown as $17,992 in 2001, $3,989 in 2002, and $8,800 in 2003. Graham described himself as an “outlaw,” who broke all the rules. Although he apparently liked his work with Offshore, he admitted that he had already broken its rules by having his wife aboard the tugboat during the trip on the night of his accident, thus jeopardizing his continued employment if that fact were discovered by Offshore’s management. Economist Kenneth Bou-dreaux, Ph.D., used Graham’s reported past income history and determined that his average annual income from 2000 through 2003 was $8,943.51; his average annual income from 2001 through 2003 was $10,393. Graham’s past wage loss using the lower average annual wage was $22,715; using the higher average annual wage, his past wage loss was $25,841. Assuming that Graham could return to employment at the current minimum wage, Boudreaux concluded that his future wage loss would be zero under both estimates.
 

 Obviously, the jury had evidence supporting a wide range of estimates for past wage loss and loss of future earning capacity, and chose to award $44,700 for past loss of income and $125,000 for loss of future earning capacity. The past loss of income award is in line with Rice’s estimate, which was based on Graham’s continued employment with Offshore. The award for lost future earning capacity was somewhat less than Rice had estimated and assumed Graham could obtain full-time employment at minimum wage. Bou-dreaux’s estimate, which the jury apparently rejected, was based on Graham’s actual average annual wages for the past several years preceding his accident. While this court might believe that Bou-dreaux’s estimate was more reasonable, based on Graham’s work attitude and inconsistent employment history, Rice’s decision to base the estimate of lost wages on Graham’s actual wages that he was earning with Offshore at the time of the accident and for the preceding three months was not unreasonable. Therefore, we conclude that the jury’s acceptance of that estimate and its award of $44,700 for past lost wages was not manifestly erroneous.
 

 Similarly, we must defer to the jury’s decision concerning the award of loss of future earning capacity. Before his accident, Graham had the capacity to earn the wages he was making with Offshore as a deckhand. The evidence establishes that after his accident, he no longer had that capacity. His injury deprived him of a capacity he would have been entitled to enjoy even though he might never have profited from it monetarily. Therefore, the jury’s award of $125,000 for loss of future earning capacity was well within its discretion and must be upheld.
 

 General Damages
 

 General damages involve mental or physical pain or suffering, inconven
 
 *1018
 
 ience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money.
 
 Boudreaux v. Farmer,
 
 604 So.2d 641, 654 (La.App. 1st Cir.),
 
 writs denied,
 
 605 So.2d 1373, 1374 (La.1992). The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration.
 
 Jenkins v. State ex rel. Dep’t of Transp. and Dev.,
 
 06-1804 (La.App. 1st Cir.8/19/08), 993 So.2d 749, 767,
 
 writ denied,
 
 08-2471 (La.12/19/08), 996 So.2d 1133. Much discretion is left to the judge or jury in the assessment of general damages. LSA-C.C. art. 2324.1. In reviewing a general damage award, a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion.
 
 Smith v. Goetzman,
 
 97-0968 (La.App. 1st Cir.9/25/98), 720 So.2d 39, 48. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257, 1261 (La.1993),
 
 cert. denied,
 
 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion.
 
 Coco v. Winston Indus., Inc.,
 
 341 So.2d 332, 335 (La.1976);
 
 Moss v. State,
 
 07-1686 (La.App. 1st Cir.8/8/08), 993 So.2d 687, 704,
 
 writ denied,
 
 08-2166 (La.11/14/08), 996 So.2d 1092.
 

 The jury awarded Graham $200,000 for past physical and mental pain and suffering and $25,000 for loss of enjoyment of life; it did not award anything for future physical and mental pain and suffering. Graham was injured on December 17, 2003. The injuries to his knee and ankle were treated with physical therapy, steroid injections, and pain medications and were substantially resolved within four to six months. However, the back injury was another matter. Graham testified that within a week after the accident, he could not bend down to pick up a piece of paper, because the pain in his back was too great. Graham and his wife, Cindy, both testified that he spent much of his time lying down in order to relieve his back pain. The physical therapy for his knee and ankle aggravated this pain. His treating physicians continued him on pain medications, steroids, and muscle relaxers. Cindy kept notes on his condition for several months after the accident, and many of those discuss her husband’s severe depression and difficulty sleeping. She also testified, and her notes reflect, that the oral steroids caused his blood pressure to go very high. Graham said that one of his physicians gave him an injection into the lower back in an effort to relieve the back pain, but this caused him extreme pain and did nothing to help his condition. Six months after the accident, he began seeing Dr. Adatto, complaining of some neck pain and severe lower back pain. At that point, his wife said, he could not even bend over. Dr. Adatto began conservative treatments — pain medications and stretching exercises — but after reviewing x-rays and an MRI, he indicated Graham had a herniated lumbar disc and should consider surgery. Graham resisted the surgery for months, but since he was not improving, he eventually agreed. Anterior lumbar fusion surgery at the L-5, S-l level was done in May 2005, after which Graham had to wear a back brace, continue on pain medications and muscle relaxants, and have follow-up visits with Dr. Adatto. By April 2006, Dr. Adatto noted that although Graham was still taking sleeping pills, pain
 
 *1019
 
 pills, and muscle relaxants now and then, the condition of his lower back had improved considerably. Graham’s neck and shoulder still bothered him occasionally, but not significantly. Dr. Adatto also indicated that Graham was probably close to maximum recovery at that point, and would have permanent restrictions in his ability to perform hard labor. Graham was able to do part-time lawn work by August 2006, and he testified at the trial in November 2006 that he felt great.
 

 Keeping in mind the jury’s discretion in awarding general damages, we conclude that, although the total award of $225,000 in general damages is on the high side, it is not an abuse of discretion for a disabling back injury. Graham was in pain for at least 18 months after his accident, and much of that time, the pain was severe and he was extremely depressed. After over a year of ineffective conservative therapy, he underwent a surgical procedure to correct the back condition. While this relieved his pain to a great extent, he is permanently disabled from his former work and will always have to restrict his activities. Therefore, we cannot find an abuse of discretion in the jury’s award of general damages.
 

 CONCLUSION
 

 Based on the foregoing, we reverse the portion of the judgment that limited CEC’s liability to $160,000. In all other respects, the judgment is affirmed. All costs of this appeal are assessed to Offshore and CEC in proportion to their shares of fault.
 

 REVERSED IN PART AND AFFIRMED IN PART.
 

 McDONALD, J., concurs.
 

 [1]
 

 . A “barge fleet” is essentially a floating parking lot in a designated location along a waterway for storage of barges and other marine equipment.
 

 [2]
 

 . The August 4, 2003 bill of sale to Cashman states the name of the dredge barge was CONCILE. However, the parties and the record consistently refer to it as CONICAL, so we will use this name also.
 

 [3]
 

 . According to the record, Craven filed a similar suit in the United States District Court for the Southern District of Mississippi.
 

 [4]
 

 . Based on the jury’s findings, the judgment also awarded $82,858.49 in cure benefits and $13,515.00 in maintenance benefits.
 

 [5]
 

 . The applicable statutes in Title 46 of the United States Code referenced in this opinion were all renumbered by Pub.L. 109-304, October 6, 2006, 120 Stat. 1485. We refer to the current numbers in this opinion.
 

 [6]
 

 . At oral arguments, the parties questioned whether the state court had jurisdiction over the limitation of liability defense raised by Cashman. After researching this issue, we conclude that the state court did have subject matter jurisdiction, because Cashman did not institute a separate limitation of liability procedure in the federal district court under 46 U.S.C. § 30511(a), thus distinguishing this case from the majority of those questioning the state court's jurisdiction. We agree with the Fourth Circuit’s thorough analysis of this issue in
 
 Howell v. American Cas. Co. of Reading, Pennsylvania,
 
 96-0694 (La.App. 4th Cir.3/19/97), 691 So.2d 715, 730-32,
 
 writs denied,
 
 97-1329, 1379, and 1426 (La.9/5/97), 700 So.2d 512, 515, and 518. Therefore, the state court had jurisdiction over this issue, and this court has jurisdiction over the appeal of this issue.
 

 [7]
 

 . The contract for barge fleeting and maintenance services states the full name of this company was RiverLand Services L.L.C.