McClendon, j.
|2In this personal injury suit, the defendants appeal a trial court’s judgment awarding damages for lost wages and loss of future earning capacity. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
This matter arises from a two-vehicle accident that occurred on March 5, 2012, in Baton Rouge. The accident involved a 1998 Mack tractor-trailer truck driven by the defendant, Jana Sanasac, and a 2009 Toyota MTX driven by the plaintiff, Alanda Lemings. Ms. Lemings was stopped at a red light when she was rear-ended by the vehicle driven by Ms. Sanasac.
On February 27, 2013, Ms. Lemings filed a Petition for Damages against Ms. Sanasac; Kiln Trucking, Inc., Ms. Sana-sac’s employer; and State National Insurance Company, the defendants’ liability insurer. The defendants stipulated to liability prior to trial. After a trial on August 12, 2015, the trial court signed a judgment on August 28, 2015, in favor of Ms. Lemings, assigning 100% of the fault to the defendants. The trial court then made the following award of damages to Ms. Lemings:
The defendants have suspensively appealed, asserting in their sole assignment of error that the trial court erred in awarding $582,418.00 for Ms. Lemings’ lost wages and loss of future earning capacity. They assert that Ms. Lemings failed to introduce competent evidence establishing her entitlement to said damages. Therefore, according to the defendants, there is no reasonable factual basis to support the trial court's conclusion, and the finding is clearly wrong.
I «DISCUSSION
A plaintiff seeking damages for past lost wages bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident. Boyette v. United Services Auto. Assn., 00-1918 (La. 4/3/01), 783 So.2d 1276, 1279. The trial court is accorded broad discretion in assessing awards for past lost earnings, but there must be a factual basis in the record for the award. A plaintiff bears the burden of proving his claim for lost earnings. For purposes of determining damages, the amount of lost earnings need not be proved with mathematical certainty, *399 but by such proof as reasonably establishes the claim, and such proof may consist only of the plaintiffs own testimony. Driscoll v. Stucker, 04-0589 (La. 1/19/05), 893 So.2d 32, 53. A trial court’s award for past lost wages is subject to the manifest error standard of review because such damages must be proven with reasonable certainty. Graham v. Offshore Specialty Fabricators, Inc., 09-0117 (La.App. 1 Cir. 1/8/10), 37 So.3d 1002, 1015.
With regard to a claim for loss of earning capacity, earning capacity refers to a person’s potential and is not determined by actual loss. Hobgood v. Aucoin, 574 So.2d 344, 346 (1990); Woods v. Hall, 15-1162 (La.App. 1 Cir. 4/20/16), 194 So.3d 689, 693-94. An award of loss of future income is not predicated merely upon the difference between a plaintiffs earnings before and after a disabling injury, but also encompasses the loss of one’s earning potential or capacity, that is the loss or reduction of a person’s capability to do that for which he is equipped by nature, training, and experience. David v. Our Lady of Lake Hosp., Inc., 02-1945 (La.App. 1 Cir. 6/27/03), 857 So.2d 529, 533. Factors to consider in fixing awards for loss of earning capacity include age, life expectancy, work life expectancy, appropriate discount rate, the annual wage rate increase, prospects for rehabilitation, probable future earning capacity, loss of earning ability, and the inflation factor or decreasing purchasing power of the applicable currency. Tate v. Kenny, 14-0265 (La.App. 1 Cir. 12/23/15), 186 So.3d 119, 129.
The fact finder’s determination of the amount, if any, of an award of damages, including lost earning capacity, is a finding of fact. Ryan v. Zurich American Ins. Co., 07-2312 (La. 7/1/08), 988 So.2d 214, 219. However, unlike awards for past lost earnings, awards for lost future income or loss of future earning capacity are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Therefore, the fact finder is given much discretion in fixing these awards. See LSA-C.C. art. 2324.1; Graham, 37 So.3d at 1016. Nevertheless, a projection of loss of future earning capacity must have a factual basis in the record, and an award may not be based upon speculation, possibility, or conjecture. Jenkins v. State ex rel. Dept. of Transp. and Dev., 06-1804 (La.App. 1 Cir. 8/19/08), 993 So.2d 749, 775, writ denied, 08-2471 (La. 12/19/08), 996 So.2d 1133.
Additionally, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Ryan, 988 So.2d at 222; Graham, 37 So.3d at 1016. A fact finder may accept or reject the opinion expressed by an expert, in whole or in part. The trier of fact may substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole. Ryan, 988 So.2d at 222.
Further, where expert testimony differs, it is the trier of fact who must determine the more credible evidence, and factual findings based upon that determination may not be overturned unless manifest error appears in the record. In deciding to accept the opinion of one expert and reject the opinion of another, a trial court can virtually never be manifestly erroneous. Hannan v. Hannan, 99-0842 (La. App. 1 Cir. 5/12/00), 761 So.2d 700, 705, writ denied, 00-1723 (La. 9/29/00), 770 So.2d 349.
In the present case, the defendants contend that the record does not support the trial court’s award of lost wages and loss of future earning capacity. *400 Particularly, they assert that all of the expert testimony established unequivocally that Ms. Lemings could return to work on a full-time basis and that there were a myriad of jobs available to her at the same income that she was able to earn prior to the subject accident.
IfiThe record reflects that, prior to the accident, Ms. Lemings was employed as a labor and delivery room nurse, a physically demanding job considered medium to heavy duty level work. Ms. Lemings testified that, immediately after the accident, her head, neck, back, and leg began hurting. She stated that although she was able to drive from the accident to Earl K. Long Hospital to take a recertification class, on the day following the accident, the pain was “much, much worse.” Ms. Lemings then went to Lake After Hours, an urgent care facility, where she was diagnosed with contusion of the hand, cellulitis of the leg, and sprain of the knee and leg. Thereafter, Ms. Lemings began treating with her primary care physician, Dr. Luther Stewart, who also diagnosed cervicalgia and lumbago. Because of continued complaints of pain, Dr. Stewart referred Ms. Lemings to Dr. Eric K. Oberlander, a neurosurgeon.
Dr. Oberlander first saw Ms. Lemings on May 7, 2012. After his medical assessment, Dr. Oberlander’s opinion was that Ms. Lemings “had a bad neck” and that she would need surgery in the future. An April 6, 2012 MRI showed disc herniations at C5-6, C6-7, and C7-T1, with spondylosis and neural foraminal narrowing. Dr. Ober-lander stated that some of the findings on the MRI were “likely acute” and some “likely exacerbated” by the accident and that Ms. Lemings became symptomatic with the subject accident. Ms. Lemings wished to initially try conservative treatment, which included epidural injections and physical therapy that- provided her some relief.
Later in 2012, Ms. Lemings, who last worked as a self-employed travel nurse, accepted a 13-week nursing assignment in Santa Clara, California. She stated that she completed the contract, but by the second week realized that it was a mistake. Ms. Lemings testified that her pain grew worse and that it took her extra time to drive home because on the way back she had to spend an entire day in bed. Ms. Lemings also testified that she has not tried to work since her contract in California.
When Dr. Oberlander saw that conservative treatment was not affording Ms. Lemings relief, he ordered an updated MRI, which was performed on May 7, |„2013. Dr. Oberlander stated that according to the MRI, Ms. Lemings’ condition may have gotten “a little worse” and that surgery was required to permanently fix the problem in her neck and back. On June 21, 2013, Ms. Lemings underwent an anterior cervical discectomy and fusion at multiple levels. Dr. Oberlander stated that he removed the four damaged discs, replaced them with spacers, and clamped it all with a four-level plate. Dr. Oberlander further stated that Ms. Lemings had a “rough go” of it following surgery, noting that she had trouble swallowing and continued to have pain. Dr. Oberlander ordered x-rays and a CT scan, which showed that the surgery and the healing “looked good.” Ms. Lem-ings was diagnosed with post-laminectomy syndrome and occipital neuralgia. Dr. Ob-erlander also noted that Ms. Lemings’ neck was angled in the wrong direction, which accelerates wear and tear. Additionally, he stated that fusion surgeries are well known to increase stress on the adjacent level in the spine.
Karl Kleinpeter, a physical therapy expert, treated Ms. Lemings for approximately two months beginning on May 14, 2012, after she was referred from Dr. Ob- *401 erlander. Mr. Kleinpeter also saw Ms. Lemings post-operatively, at which time he found her to have a 42% disability rating. When asked if Ms. Lemings was capable of light sedentary work, Mr. Kleinpeter stated that would depend on what her job entailed. It was his opinion that it would be difficult for Ms. Lemings to sustain a 40-hour work week even in a job involving only paperwork. However, he indicated that he would defer to the findings of her functional capacity evaluation (FCE).
On July 16, 2014, Billy Naquin, also an expert in the field of physical therapy, conducted the FCE of Ms. Lemings at the request of Dr. Oberlander. According to the FCE, Ms. Lemings was not able to return to her previous level of work as a registered nurse on a labor and delivery floor, as that position was classified at a medium physical demand level. However, the FCE also showed that Ms. Lemings demonstrated the ability to perform sedentary work with certain limitations as 17noted in the FCE.[1] Mr. Naquin therefore classified Ms. Lemings as capable of functioning at a sedentary to light physical demand level based on full-time work.
In contrast, Ms. Lemings testified that she did not think that she was capable of light or sedentary work on a daily basis. She stated that she has problems sitting and has headaches that affect her concentration. Ms. Lemings also stated that she did not think she was employable because if she had a bad day, she would not be'able to work the following day. Additionally, Ms. Lemings testified that she cannot lift anything and can only drive for about thirty minutes. Ms. Lemings further stated that because she is unable to take pain medication, she was referred to Dr. Martin A. Langston for pain management, whose care she was still under at the time of the trial.
Carla D. Seyler, a certified and' licensed vocational rehabilitation counselor and accepted by the trial court as an expert in vocational rehabilitation, testified for the defendants. Ms. Seyler testified that she met with Ms. Lemings on October 24, 2014. She stated that she performed intelligence screening, tested academic skills and achievement, and conducted other tests to see how Ms. Lemings was functioning. Ms. Seyler testified that she based Ms. Lemings’s physical capabilities on the records provided, including the FCE and the concurrence of Dr. Langston.
While Ms. Seyler did not think that Ms. Lemings could be a labor and delivery nurse as she had been in the past, she believed that there were other types of available nursing positions that Ms. Lem-ings was qualified for and 'could perform within her physical limitations.[2] Ms. Seyler *402 stated that nursing positions |sin the area are in demand and readily available. Ms. Seyler further testified that because Ms. Lemings could no longer work as a floor nurse, she looked at administrative positions that would not require hands-on patient care. Ms. Seyler stated that Ms. Lemings has a Bachelor of Science degree in nursing and not just an associate’s degree, she has kept her license current, and she has an administrative background. Ms. Seyler testified that she has hired nurses with a similar background to Ms. Lemings.
On cross-examination, Ms. Lemings unsuccessfully attempted to impeach Ms. Seyler’s testimony regarding Ms. Lemings’ release to return to work, with excerpts read from Dr. Langston’s deposition.[3] Upon questioning, Ms. Seyler testified that although she was aware that Dr. Langston did not consider Ms. Lemings to be at maximum medical improvement, Dr. Lang-ston had indicated in his August 2015 deposition that Ms. Lemings could perform sedentary work within the limitations of the FCE.[4]
Dr. William P. Culbertson, Ph.D., a retired professor at LSU and an expert in the field of economics and income calculation, testified on behalf of Ms. Lemings. He stated that he was retained to do an analysis regarding past, present, and future loss of income and economic loss for Ms. Lemings with the assumption that she was unable to return to any gainful employment.[5] Dr. Culbertson looked at Ms. Lemings’ tax returns for the years 2008 through 2012, and he considered her yearly earning capacity to be $75,000.00. Dr. Culbertson stated that Ms. Lemings was injured at 53.6 years. Using government tables, he determined that her work expectancy from the date of the accident was 8.6 years and stated that the length of time between the date of Ms. Lemings’ injury and the date of trial was 3.4 years. [flHe therefore calculated her past lost wages to be $255,000.00 through the date of trial. With regard to Ms. Lemings’ loss of earning capacity, Dr. Culbertson then computed that Ms. Lemings’ future lost wages would be $378,194.00, using a discounted rate for her future work expectancy of 5.2 years. His report also included an amount for loss of household work of $54,109.00. In accordance vrith his calculations, Dr. Culbertson considered Ms. Lemings’ total loss under these circumstances to be $687,303.00.
Dr. Culbertson further testified that he reviewed the report of Dr. G. Randolph Rice, Ph.D., the defendants’ economic expert. Dr. Rice chose to use the amount of $69,424.00 as Ms. Lemings’ yearly earning capacity at the time of the injury, as opposed to Dr. Culbertson’s number of $75,000.00. Dr. Rice also deducted Ms. Lemings’ employee business expenses from that number, which Dr. Culbertson did not do. Dr. Culbertson testified if he had done so, his number would be approximately nine percent lower.
*403 When questioned directly by the trial court as to what Ms. Lemings’ loss of future earning capacity would be if she could work, but at only $10.00 per hour, Dr. Culbertson stated that a 40-hour work week at $10.00 per hour would equal a yearly income of $20,800.00. Using the 5.2 years future work life expectancy and discount rate, Dr. Culbertson then calculated the amount of $104,886.00 in future income. Subtracting that amount from his total-loss figure of $687,303.00, which was based on Ms. Lemings’ inability to return to work, Dr. Culbertson determined that Ms. Lemings’ lost wages and loss of future earning capacity under those circumstances would be $582,418.00.
Dr. Rice, a professor emeritus in the Department of Economics at Louisiana State University, testified that he was asked to make calculations assuming that Ms. Lemings could return to work earning between $21.00 per hour and $30.00 per hour. He stated that he learned the economics of this case from Dr. Culbertson’s report and also looked at the tax records and the vocation report of Ms. Seyler. Dr. Rice testified that he took out Ms. Lem-ings’ expenses, which was a slight adjustment to Dr. Culbertson’s report, and he duplicated the report, but |1ftwith slightly lesser numbers. For example, subtracting Ms. Lemings’ expenses, her past losses were $206,481.00. Using the same discount rate and work life expectancy of 5.2 years that Dr. Culbertson used,[6] Dr. Rice came up with $323,060.00 as the present value of Ms. Lemings’ future ability to earn without the consideration of returning to work. However, Dr. Rice stated that if Ms. Lem-ings was able to return to work at $21.00 per hour for a 40-hour work week, she would be able to earn $43,680.00 per year. From that amount, Dr. Rice calculated a discounted present value of $223,561.00 for Ms. Lemings’ future earning capacity. Using a $30.00 per hour rate for full-time work, Dr. Rice calculated a present value of $319,373.00 for Ms. Lemings’ future ability to earn.
At the conclusion of the trial, the trial court took the matter under advisement. On August 28, 2015, the trial court rendered and signed its judgment, concluding that Ms. Lemings “has proven her claim for lost wages and loss of future earning capacity,” and it awarded a total of $582,418.00. The trial court also stated in the judgment that Ms. Lemings “is not completely disabled and is capable of working.”
Although the trial court did not separate the awards for lost wages and for loss of future earning capacity, it is apparent that the trial court adopted Dr. Culbertson’s testimony and calculations in rendering its award for these items of damage.[7] Dr. Culbertson’s figure of $255,000.00 for lost wages was based on an income of $75,000.00 per year for the 3.4 years between the date of the accident and the date of trial. In deciding to accept the opinion of one expert over the opinion of another expert, a trial court can virtually never be manifestly erroneous. See Hannan, 761 So.2d at 705. Therefore, we find that the $255,000.00 amount in past lost wages to be reasonable and substantiated by the record. Further, given that the trial court did not make the legal determination until *404 trial that Ms. InLemings was capable of working, we also find no manifest error in the trial court using the date of trial with regard to the calculation for past lost wages.
The defendants assert, however, that the trial court erred in finding that Ms. Lem-ings could only find employment at $10.00 per hour. In calculating Ms. Lemings’- loss of future earning capacity, it appears that the trial court may have relied on Ms. Lemings’ testimony regarding her search of clerical positions on monster.com. According to her testimony, she researched clerical positions at “minimum wage or "a little higher” that were in the range of $10.00 per hour.[8] Those positions only required a high school diploma at most.-The record is devoid of any indication that her search was within the medical field or' was one that took into account her education, training, and experience as a nurse. Therefore, any possible reliance on such non-probative evidence would have been error.
However, it is well-settled that the trial court’s oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment. Wooley v. Lucksinger, 09-0571 (La. 4/1/11), 61 So.3d 507, 572. See also LSA-C.C.P. arts 1918, 2082 and 2083. Judgments are often upheld on appeal for reasons different than those assigned by the trial court. Wooley, 61 So.3d at 572. It is not the role of the appellate court to speculate as to how a trial court may have reached its conclusion. While it would clearly have been error for the trial court to rely on Ms. Lemings’ monster.com search, which failed to take into account her training and background, because judgments, not reasons for judgment, are appealed, we nevertheless- find • that the record reasonably supports the trial court’s award for loss of future'earning capacity.[9]
I iaMs. Lemings was fifty-eight years old at the time of trial. Dr. Oberlander testified that Ms. Lemings will likely have some level of chronic pain forever. Mr. Kleinpeter testified that when he met with Ms. Lemings after her surgery, she was unable to meet her long-term physical therapy goals. He opined that any employment opportunities would have to consider whether Ms. Lemings could take breaks and extended lunches as necessary. It was Mr. Kleinpeter’s opinion that it would be difficult for Ms, Lemings to sustain a sedentary forty-hour work week. Ms. Lemings also testified that she did not believe that she was capable of working full time. Although contradictory testimony was offered at trial, the trier of fact is free to accept or reject the testimony expressed by any expert, -in whole or in part. See Ryan, 988 So.2d at 222. After a thorough review of the record, we cannot say that the trial court abused its vast discretion and, thus, find no error in the trial court’s award of $582,418.00 for Ms. Lemings’ past lost wages and loss of future earning capacity.
CONCLUSION
For the above and foregoing reasons, we affirm the August 28,2015 judgment of the *405 trial court. All costs of this appeal are assessed to the defendants, Jana Sanasac, Kiln Trucking, Inc., and State National Insurance Company.
AFFIRMED.
Whipple, C.J., concurs for reasons assigned.
Guidry, J,, concurs in the result.

. According to the FCE, Ms. Lemings was considered capable of frequent sitting, standing, bending/stooping, kneeling, crouching, and rotation, as well as occasional walking, reaching, squatting, and climbing stairs. Mr. Naquin also indicated that Ms. Lemings could occasionally lift and carry twenty pounds, push/pull approximately fifty pounds, and carry twelve pounds with each arm. Ms, Lemings could also frequently lift or carry ten pounds and constantly handle five pounds.

. Ms. Seyler testified that she conducted surveys of the local job market and contacted local employers from June 24, 2014 to August 11, 2015, the day before trial, and found the following jqb possibilities: an intake coordinator at Baton Rouge General Hospital at $22.00 to $28.00 per hour; a clinical appeal coordinator at $50,000.00 to $55,000.00 per year; a health care services nurse from home at $20.00 to $40.00 per hour; a telephonic registered nurse case manager at $30.00 to $35.00 per hour; a clinical documentation specialist with Lane Regional Medical Center in Zachary at $21.00. to $31.00 per hour; a registered nurse preadmission person at Baton Rouge General Hospital at $40,000.00 per year; a nurse case manager, requiring driving, at $26.00 to $30.00 per hour; a clinical *402 liaison with AMG Specialty Hospital at $40,000.00 to $60,000.00 per year; a registered nurse transition navigator with Ochsner Hospital at $65,000.00 per year; and a utilization review nurse with United Health Care at $55,000.00 to $75,000.00 per year.

.We note that Dr. Langston’s deposition was not made part of the record.

. Ms. Lemings’ counsel read from Dr. Lang-ston’s deposition, wherein Dr. Langston stated, regarding the FCE, "I would agree with the recommendation, as far as sedentary work with the limitations as outlined here.” Further, the trial court ultimately found that Ms. Lemings was capable of working.

. However, we again note that the trial court determined that Ms. Lemings was "not completely disabled and ... capable of working."

. Dr. Rice agreed with Dr. Culbertson, after reviewing Ms. Lemings’ history of employment, that her work-life expectancy of 62.2 years "would seemingly be more attuned to her circumstances” than her working to 66.8 years.

. We note that the figure testified to by Dr, Culbertson of $582,418.00 for past lost wages and loss of future earning capacity, based on an earning capacity of $10.00 per hour, is the exact figure awarded by the trial court.

. Ms. Lemings testified, “When ... I got online at monster.com, I found the only jobs that were listed were, like, file clerk or office clerical work.” Thereafter, when asked if she was aware of any of the type of positions suggested by Ms. Seyler, Ms. Lemings stated that “[tjhere were no jobs like that.”

. We further note that the trial court’s judgment refers to Ms. Lemings as not being "completely disabled.” Therefore, it is unclear as to whether the trial court relied on die $10.00 per hour figure or calculated her loss of future earning capacity based oh less than a forty-hour work week.