PETTIGREW, J.
In this case involving a slip and fall in a hospital, the hospital appeals a trial court judgment in favor of the plaintiff. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On June 19, 2014, Torsor Toussaint accompanied her mother to Baton Rouge General Medical Center's Bluebonnet Campus ("BRGMC") for medical services. Mrs. Toussaint and her mother entered the hospital through the emergency room entrance and proceeded down a hallway towards the admissions desk. At some time prior to their arrival, a spill was discovered on the floor near the admissions desk, and BRGMC's housekeeper, Lakeysha Franklin, was sent to mop the spill. After Ms. Franklin located the spill, set up a "wet floor" sign, and began mopping, Mrs. Toussaint and her mother entered the admissions area from behind Ms. Franklin, walked to their right around the area being mopped by Ms. Franklin, and stopped at the admissions desk. After mopping, Ms. Franklin repositioned the "wet floor" sign within the area she had just mopped and left the area. After checking in at the admissions desk, Mrs. Toussaint and her mother sat down in a waiting area across from the admissions desk. Less than a minute later, Mrs. Toussaint stood back up and began walking back down the hall towards the emergency room entrance, this time passing on the opposite side of the mopped area. After walking past the "wet floor" sign placed by Ms. Franklin, Mrs. Toussaint slipped and fell in what she later described as "an excessive amount of water on the floor," striking her right knee on the floor and allegedly sustaining injuries.
Mrs. Toussaint filed a petition for damages for the injuries she sustained in the slip and fall against BRGMC, as well as the contractor that manages BRGMC's housekeeping department, Hospital Housekeeping Services, LLC ("HHS"). After the bench trial in this matter began, Mrs. Toussaint settled her claims against HHS for $2,500.00, reserving her rights against BRGMC. After the conclusion of the trial, the trial court ruled in favor of Mrs. Toussaint, finding that BRGMC did not do enough to warn the public of the wet floor. The trial court allocated one hundred percent of the fault for Mrs. Toussaint's injuries to BRGMC, and awarded Mrs. Toussaint special damages of $6,900.40, general damages of $15,000.00, and deposition costs of $1,500.00. BRGMC filed a suspensive appeal, arguing that the trial court erred in finding that BRGMC was negligent, in not *1154 allocating any comparative fault to Mrs. Toussaint or HHS, and in awarding an excessive amount of general damages for Mrs. Toussaint's injuries.
DISCUSSION
Negligence of BRGMC
The legislature has not specifically addressed the burden of proof applicable in a slip-and-fall claim against a hospital. Consequently, jurisprudence addressing the burden placed on a hospital is not affected by the statute governing merchant liability for slip-and-fall claims found at La. R.S. 9:2800.6. See Terrance v. Baton Rouge Gen. Med. Ctr., 10-0011, pp. 3-4 (La. App. 1 Cir. 6/11/10), 39 So.3d 842, 844, writ denied, 10-1624 (La. 10/8/10), 46 So.3d 1271. Because the hospital is not a "merchant," we must examine the hospital's duty in light of the facts of this case under a negligence theory of liability.
Under a negligence standard, a hospital owes a duty to its visitors to exercise reasonable care for their safety, commensurate with the particular circumstances involved; but the duty owed is less than that owed by a merchant. Mrs. Toussaint must show that she slipped, fell, and was injured because of a foreign substance on the hospital's premises. The burden then shifts to the hospital to exculpate itself from the presumption of negligence by showing that it acted reasonably to discover and correct the dangerous condition reasonably anticipated in its business activity. The trial court must consider the relationship between the risk of a fall and the reasonableness of the measures taken by the hospital to eliminate the risk. Smith v. Northshore Reg'l Med. Ctr., Inc., 14-0628, pp. 3-4 (La. App. 1 Cir. 1/26/15), 170 So.3d 173, 176 ; Terrance, 10-0011, p. 4-5, 39 So.3d at 844. The determination of whether the measures taken by the hospital to eliminate the risk were reasonable is a question of fact. See Osorio v. Target Corp. of Minnesota, 11-1761, 2012 WL 3443333, p. 3 (E.D. La. 8/14/12).
A trial court's findings of fact will not be disturbed on appeal unless the appellate court finds they are clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880, 882 (La. 1993). The appellate court may not reverse the trial court even if the appellate court determines it would have weighed the evidence differently if sitting as the trier of fact, as long as the trial court's findings are reasonable in light of the entire record. Id. at 882. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous. Id. at 883.
BRGMC argues on appeal that Mrs. Toussaint did not carry her burden of proving that she slipped and fell in a foreign substance on the floor. Although BRGMC concedes that a small spill was discovered in the admissions area hallway just prior to Mrs. Toussaint's fall, they argue that this does not imply that the entire eighteen-foot-wide hallway was wet. In addition to testimony from Mrs. Toussaint and Ms. Franklin about the condition of the floor on the date of the accident, the trial court also viewed the BRGMC surveillance video of the events at issue in this case, starting about a minute before Ms. Franklin arrived to clean the spill and continuing until after Mrs. Toussaint left the area following the fall.
Mrs. Toussaint testified that the floor was wet in the spot where she slipped. Although she did not see water on the floor beforehand, she said that after she fell, she looked at the floor to see why she had slipped, and realized that it was wet. She also recalled that a man walked up after she fell and moved the "wet floor"
*1155 sign to the spot where she slipped, which she said was "where the water actually was."
Ms. Franklin testified that on the date of the slip and fall, she was paged to clean up a spill in the admissions area while she was in the process of cleaning a nearby bathroom, so she took her damp string mop and one "wet floor" sign and walked to the admissions area. Once she located the spill, which she said covered an area of the floor smaller than a letter-size sheet of paper and appeared to be water, she placed her "wet floor" sign on the floor, mopped up the spill, and then positioned the "wet floor" sign in the center of the area where the spill had been. Although she described the spill as small, Ms. Franklin explained that she ultimately had to mop a larger area because after she mopped one spot, she noticed another area nearby was damp, so she mopped it as well. She was not able to wring out her mop during this process, because she did not have her housekeeping cart, with her mop bucket and wringer. However, she felt certain that she had identified and mopped all of the wet areas.
Although whether the floor was wet or dry cannot be seen on the surveillance video, the video does offer support for Mrs. Toussaint's assertion that there was water on the floor where she slipped. The video shows Ms. Franklin mopping an area that appears to extend several feet in each direction without wringing out her mop; and less than two minutes after she finished, the video shows Mrs. Toussaint slipping and falling while walking in what appears to be the outer edge of the area Ms. Franklin mopped. After Mrs. Toussaint fell, the video shows a man who had been sitting nearby pointing out something on the floor where she slipped to a BRGMC employee, then moving the "wet floor" sign to that spot. Although there was no evidence offered at trial about how long the spill existed before Ms. Franklin's arrival, the surveillance video shows that nothing was done to prevent passersby from walking through the spill until Ms. Franklin arrived to clean it. In the one minute of video before Ms. Franklin's arrival, several people walked through the vicinity of the spill, potentially spreading the spill into a larger area. In light of all the evidence before the trial court, we cannot say that the trial court's conclusion that Mrs. Toussaint slipped on a wet floor was manifestly erroneous or clearly wrong.
BRGMC argues that even if there was a foreign substance on the floor where Mrs. Toussaint fell, BRGMC overcame the presumption of negligence by proving that it acted reasonably to discover and correct any dangerous condition. In concluding that BRGMC's actions were not reasonable considering the risk, the trial court found that Ms. Franklin did not use a sufficient number of "wet floor" signs to properly notify the public of the area that was wet, and that BRGMC should have had someone stand near the spill until housekeeping arrived to ensure that people did not continue to walk through it, potentially spreading the spill to other areas. BRGMC argues on appeal that this finding was erroneous because its employee, Ms. Franklin, followed housekeeping department policies and procedures, which were established with patient safety in mind.
BRGMC contracted with HHS for the provision of housekeeping management services, including management and oversight of the BRGMC housekeeping department and administration of an ongoing training program for the BRGMC-employed housekeeping staff. Jeffrey Totten, HHS President of Risk Compliance, testified that all BRGMC housekeeping employees are trained and supervised by *1156 HHS to perform their jobs in accordance with policies and procedures established by HHS based on their experience in the industry, with the safety of hospital patients, employees, and visitors in mind. HHS was managing BRGMC's housekeeping department and training the BRGMC housekeeping employees both at the time Ms. Franklin was hired and at the time of the slip and fall at issue in this case.
Mr. Totten explained that HHS trains BRGMC's housekeeping staff to be alert for spills throughout the building, to attend to any spills immediately to avoid falls, and to use "wet floor" signs properly to provide notice of a potential hazard in the area that was mopped. According to HHS policy, proper use of "wet floor" signs requires placement of the signs so that people coming from any direction can see that there is a hazard. HHS policy also states that areas that are wet should be clearly marked, with an alternative dry path provided for entrance into and exit from the area. HHS uses training videos to show housekeeping employees how to perform a variety of job tasks. Although the examples of mopping technique shown on the training videos depict the use of multiple "wet floor" signs, Mr. Totten explained that the exact number of signs necessary in a particular situation depends upon the size of the wet area. Mr. Totten explained that when a housekeeper is spot-mopping a spill, as Ms. Franklin was in this case, as opposed to mopping an entire room or hallway, the purpose of the "wet floor" sign is simply to provide notice to passersby of a hazard, but not to shut down the area entirely. According to Mr. Totten, there is no specific rule for determining how many "wet floor" signs to use when spot-mopping a spill; however, since a "wet floor" sign covers a surface area of approximately one and one-half feet when opened, and since, in his experience, an individual who encounters a "wet floor" sign will typically recognize the hazard and walk roughly one foot around either side of the sign, his opinion was that one "wet floor" sign should be sufficient for a wet area roughly three feet in circumference.
Mr. Totten testified that the sign-placement technique used by Ms. Franklin (placing the "wet floor" sign(s) in the center of the mopped area, rather than along the edges) was considered by HHS to be a "best practice" when spot-mopping, since the purpose of the sign(s) is not to cordon off the area, but rather to provide notice of a potentially hazardous area without disrupting the flow of traffic. After viewing the surveillance video, Mr. Totten's impression was that there was ample space for passersby to walk on either side of the "wet floor" sign placed by Ms. Franklin, although he conceded that a person walking between the sign and the wall (the side on which Mrs. Toussaint was walking when she slipped and fell) may have needed to turn sideways and walk close to the wall to safely avoid walking on wet floor. Although Mr. Totten testified that Ms. Franklin's sign usage was appropriate for the situation, he conceded that her use of just one "wet floor" sign in this instance, rather than two, may have been questionable. Mr. Totten felt that a second "wet floor" sign would be necessary to provide notice to the public when a wet area was larger than three to five feet. However, based on his viewing of the surveillance video and understanding of the dimensions of the hallway, Mr. Totten estimated that Ms. Franklin mopped a rectangular area, approximately three feet by six feet.[1]
*1157 Ms. Franklin testified that she was told by her supervisor, who she testified was also employed by BRGMC, to use more than one "wet floor" sign when the area she was spot-mopping was larger than five feet. She also testified that in such a case, the "wet floor" signs would be placed on the outside edges rather than the center of the wet area to clearly mark the area on the floor. Although Ms. Franklin believed that she followed this rule of thumb for floor-sign usage in this instance, it was clear from her testimony that she did not have a good understanding of what five feet of floor space looked like. When asked the distance from the admissions desk to the opposite wall, she estimated that it was five feet. When told that the floor plans show that the distance was actually eleven feet, she testified that she would disagree with that measurement. She said that she did not know how to determine whether an area was smaller or larger than five feet, so she simply looked at an area and decided whether it was "big" or "small," and based her sign usage on that determination.
Despite BRGMC's assertions that it acted reasonably to eliminate the risk because its housekeeping employee followed HHS's policies and procedures, which were created with safety in mind, the evidence does not support this assertion. Mr. Totten and Ms. Franklin both acknowledged that Ms. Franklin was supposed to approach the spill with her housekeeping cart, including her mop bucket with wringer, additional "wet floor" signs, and anything else she might need to clean the spill, as opposed to just carrying a damp mop and one "wet floor" sign to the area. By failing to bring her cart, Ms. Franklin could not wring out her mop after mopping up the spilled water to avoid leaving excess water on the floor, and she could not use additional "wet floor" signs to warn passersby of the extent of the wet area. In addition, Ms. Franklin's inability to judge the size of the mopped area caused her to make the "questionable" decision to use only one "wet floor" sign in a situation where proper calculation of the size of the area mopped would result in the use of two signs.
After careful consideration of the evidence, we cannot say that the trial court erred in concluding that BRGMC failed to act reasonably to discover and correct the dangerous condition. As noted by the trial court, the placement of the single "wet floor" sign in the center of the large area mopped by Ms. Franklin was not sufficient to warn passersby that a dangerous condition existed in the area where Mrs. Toussaint fell, regardless of whether the use of a single sign was acceptable under HHS policy. Given the risk, BRGMC's failure to use a sufficient number of signs to provide notice of the hazardous area to passersby is not reasonable. Furthermore, the trial court found that BRGMC's failure to have an employee stand near the spill until Ms. Franklin arrived to mop it, or to take some other action to prevent passersby in the busy hallway from walking through the spill and spreading it, was not reasonable considering the risk. This assignment of error lacks merit.
Comparative Fault
BRGMC's next assignment of error is that the trial court erred in not assessing any comparative fault to Mrs. Toussaint. Since Mrs. Toussaint admitted that she saw the "wet floor" sign when she first entered the admissions area, BRGMC argues that her failure to look where she was going when walking back through the mopped area was negligence, and the trial *1158 court should have allocated some percentage of fault to her.
It is well settled that the allocation of fault is a factual matter within the sound discretion of the trier of fact and will not be disturbed on appeal in the absence of manifest error. Great West Casualty Co. v. State ex rel. Dep't of Transp. & Development, 06-1776, p. 7 (La. App. 1 Cir. 3/28/07), 960 So.2d 973, 977-78, writ denied, 07-1227 (La. 9/14/07), 963 So.2d 1005. If an appellate court finds that the apportionment of fault is clearly wrong, it should adjust the award, but then only to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the trial court's discretion. Great West, 06-1776, p. 7, 960 So.2d at 978. However, when there is evidence before the trial court that, upon the trial court's reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, the appellate court should not disturb this finding absent manifest error. The manifest error standard demands great deference to the trier of fact's findings, since only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Thus, where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
Ms. Franklin was still in the admissions area, mopping the spill, at the time Mrs. Toussaint and her mother approached; and Mrs. Toussaint admits that she saw the "wet floor" sign at some point prior to her fall. However, despite her awareness of the "wet floor" sign, the surveillance video shows that Mrs. Toussaint was looking back over her shoulder, talking, as she walked back towards the mopped area. Mrs. Toussaint explained that although she was looking backwards and talking to her mother as she walked away from her seat in the waiting area, she turned back around and was "focused on where [she] was walking" before she slipped. However, since the "wet floor" sign "wasn't in the area where the water was where [she] fell," Mrs. Toussaint did not suspect that the floor might be wet in the area she was walking through. The surveillance video supports Mrs. Toussaint's claim that she had turned back around and was facing forward prior to her fall, although only one or two seconds passed between the time she turned back around and the time she slipped and fell. Nevertheless, the trial court obviously believed Mrs. Toussaint's testimony that she was focused on where she was walking and reasonably believed that the hazard represented by the "wet floor" sign did not extend all the way to the area where she slipped. Although we may have decided this issue differently as trier of fact, we cannot say that this finding of the trial court, based on a reasonable evaluation of credibility, was manifestly erroneous or clearly wrong.
BRGMC also argues that the trial court erred in failing to allocate any fault to HHS, since BRGMC's employee, Ms. Franklin, was performing her job in compliance with policies and procedures created by HHS. However, as discussed above, Ms. Franklin's actions on that day were not in compliance with HHS's policies and procedures. Her failure to bring her housekeeping cart with her equipment and supplies to do the job properly and her failure to use "wet floor" signs in a way that would provide proper notice of the hazard to passersby were both contrary to HHS policies. Furthermore, Ms. Franklin testified that she was supervised on a daily basis by a BRGMC employee, who taught her how to determine how many "wet *1159 floor" signs to use when spot-mopping. Given the evidence that Ms. Franklin's spot-mopping technique was supervised by a BRGMC employee and was not in compliance with HHS's policies, there is a reasonable factual basis for the trial court's decision not to allocate any fault to HHS. This assignment of error is without merit.
Quantum
BRGMC's final assignment of error is that the trial court's general damages award to Mrs. Toussaint was excessive. BRGMC alleges that any award to Mrs. Toussaint for pain and suffering should be minimal, considering that she treated for only five months for a soft tissue injury following the slip and fall.
It is well settled that a trial court is given great discretion in its assessment of quantum, both general and special damages. La. C.C. art. 2324.1 ; Guillory v. Lee, 09-0075, p. 14 (La. 6/26/09), 16 So.3d 1104, 1116. Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact that is entitled to great deference on review. Wainwright v. Fontenot, 00-0492, p. 6 (La. 10/17/00), 774 So.2d 70, 74. The standard for appellate review of general damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed. 2d 379 (1994), wherein the Louisiana Supreme Court stated that "the discretion vested in the trier of fact is 'great,' and even vast, so that an appellate court should rarely disturb an award of general damages." The appellate court's first inquiry should be "whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." Youn, 623 So.2d at 1260. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Graham v. Offshore Specialty Fabricators, Inc., 09-0117, p. 20 (La. App. 1 Cir. 1/8/10), 37 So.3d 1002, 1018.
Mrs. Toussaint described her fall at BRGMC as "a hard fall," in which she landed on her right knee and her wrist. She sought medical attention right after the fall in BRGMC's emergency room and reported pain in her right knee and left mid back up to her left scapula. She assessed her pain level in the emergency room as a 10 out of 10. X-rays were taken of her knee and left shoulder, and she was given a prescription for a pain medication[2] and a muscle relaxant and discharged with instructions to follow up with her primary care physician.
Four days later, on June 23, 2014, Mrs. Toussaint sought treatment from Dr. F. Allen Johnston, an orthopedic surgeon. Dr. Johnston treated her for knee pain,[3] which she described on her first visit to his office as "throbbing sharp pain throughout her knee with some stiffness, swelling, and bruising." He noted that her movements were guarded, she walked with a limp, and she had significant tenderness, which made it difficult to examine her knee at that appointment. Although x-rays taken of her knee at her first appointment were *1160 normal, a July 10, 2014 MRI suggested patellofemoral malalignment with some problems beneath the patella, which Dr. Johnston believed coincided with her symptoms and the way in which she struck her knee when she fell. Dr. Johnston prescribed anti-inflammatory medication, a topical cream, and recommended cortisone injections and physical therapy. She declined the cortisone injections because she was afraid, and did not go to physical therapy because she could not afford it; however, she testified that she took the pain medication and used the topical cream he prescribed, and also used a cane on his recommendation for "about four weeks."
On August 8, 2014, Mrs. Toussaint reported to her primary care physician, Dr. Kenyatta Shamlin, that she had hurt her right knee and right shoulder in a slip-and-fall accident at BRGMC. Dr. Shamlin prescribed a muscle relaxant, Ibuprofen, and Naproxen, and noted that Mrs. Toussaint needed an MRI of her right shoulder. On August 28, 2014, Mrs. Toussaint reported neck, shoulder, and back pain to Dr. Shamlin's nurse, and the encounter note from that date states that she was referred for an MRI of her cervical spine. She returned to Dr. Shamlin on September 12, 2014, complaining of headaches, neck pain, mid-to-upper back pain, and right shoulder pain. At that visit, Dr. Shamlin prescribed only Valium, although she noted that Mrs. Toussaint was still taking the muscle relaxant, Ibuprofen, and Naproxen, and that she still needed an MRI of her cervical spine. On September 16, 2014, Mrs. Toussaint again complained of neck pain, and Dr. Shamlin refilled her Naproxen.
On September 15, 2014, Mrs. Toussaint underwent an MRI of her cervical spine for her neck and right shoulder pain. The CT showed bulging discs at multiple levels and a right-sided disc herniation, and Dr. Shamlin subsequently referred her to an orthopedist, Dr. Jorge Isaza, for these issues. However, Mrs. Toussaint did not make an appointment with Dr. Isaza because she could not afford the out-of-pocket cost. Dr. Shamlin refilled Mrs. Toussaint's Naproxen prescription again on October 27, 2014.
On November 18, 2014, Mrs. Toussaint returned to Dr. Johnston, stating that her knee pain was beginning to improve, although she still had some discomfort behind her kneecap; however, she related to him for the first time since the Patient Intake Form that she was having right-sided neck pain which extended into her shoulder and mid-back, and that she had already had an MRI of these areas. Dr. Johnston prescribed an anti-inflammatory medication and asked her to return with a copy of the MRI so that he could look at it; however, Mrs. Toussaint never returned to his office after that date.
On February 12, 2015, Mrs. Toussaint returned to Dr. Shamlin and reported that she was still seeing an orthopedist for her knee injury and that she planned to start physical therapy soon. Dr. Shamlin's records from that visit noted that she had no neck pain or stiffness, no back pain or stiffness, and no shoulder joint tenderness. Mrs. Toussaint was given a prescription for a muscle relaxant and Naproxen at this visit. Dr. Shamlin's medical records following the February 12, 2015 visit, through July 2015, do not appear to contain any complaints related to her knee, neck, back, or shoulder.
BRGMC points out that Mrs. Toussaint had reported complaints of neck and back pain to physicians before this slip and fall. But although Mrs. Toussaint admitted complaining to Dr. Shamlin about right shoulder pain just two weeks prior to her slip and fall at BRGMC, and also complaining of back pain in the past to Dr. Shamlin, she explained that those complaints *1161 were just "aches and pains here and there," different from the pain she experienced after the slip and fall, and were probably related to her cosmetology work.
Although Mrs. Toussaint did not return to Dr. Johnston with a copy of her MRI as he requested, Dr. Johnston reviewed the MRI for his deposition, and opined that Mrs. Toussaint's complaints of pain in her neck and shoulder were consistent with the bulging discs and right-sided herniation shown on the MRI, although he could not say with certainty whether or not the slip and fall caused those injuries. Dr. Johnston did believe that it was more probable than not that Mrs. Toussaint's knee injury, which he described as basically a bruise to the backside of her kneecap, was caused by the slip and fall. He based this opinion on Mrs. Toussaint's description of the fall and her complaints of pain, the MRI of her knee, and his viewing of the surveillance video of her striking her knee on the floor.
There was conflicting evidence as to the duration of Mrs. Toussaint's symptoms. Mrs. Toussaint's deposition was taken in March 2016. On that date, she stated that she no longer had any pain whatsoever that she related to her slip and fall. However, during the October 17, 2017 bench trial, she testified that while her symptoms have improved, she still has good days and bad days, and she takes pain medicine prescribed by Dr. Shamlin "nearly every day" for the knee, neck, and back pain caused by the slip and fall. When questioned about these contradictory statements, she explained that during her deposition, she thought she was being asked whether she had any pain at that moment, and she was having a "good day" that day and was in no pain. Mrs. Toussaint admitted at trial that she was involved in an automobile accident the month before her deposition,[4] in which she allegedly injured her neck, back, and knee, but she described those injuries at trial as "soreness," which made it difficult for her to tell whether she was still having pain from the slip and fall at the time of her deposition. However, at the time of trial, she believed that the automobile accident had only "aggravated the disc again and that pain from the fall [at BRGMC] came back."
After a careful review of the evidence, and considering the vast discretion vested in the trier of fact, we cannot say that the trial court abused its discretion in making its general damages award to Mrs. Toussaint Dr. Johnston testified that it was more probable than not that Mrs. Toussaint's knee pain was caused by the slip and fall at BRGMC, and Mrs. Toussaint testified that while her knee pain had improved, she still had bad days when she experienced pain at the time of trial, over three years after the fall, and she took medicine for pain nearly every day. The trial court obviously credited Dr. Johnston's opinion that Mrs. Toussaint's knee injury was caused by the slip and fall, as well as Mrs. Toussaint's testimony that she was still experiencing some pain from the fall. As such, we cannot say that the trial court erred in awarding Mrs. Toussaint general damages for her pain and suffering of $15,000.00.
CONCLUSION
The trial court judgment in favor of plaintiff, Torsor Toussaint, and against defendant, Baton Rouge General Medical *1162 Center, is affirmed. Costs of this appeal are assessed to Baton Rouge General Medical Center.
AFFIRMED.

Mr. Totten testified that when standing, a wet floor sign covers about one and a half feet of surface area, and that it appeared that Ms. Franklin mopped approximately one foot on either side of the sign, "North and South" and two or two and a half feet "East and West" of the sign.

Although Toradol IM was ordered, Mrs. Toussaint refused the injection and stated that she would fill a prescription instead.

Although the Patient Intake Form she completed at her first office visit indicated head, neck, mid back, upper back, and right knee pain, Dr. Johnston testified that he believed her "main focus" was on her right knee, and that she did not mention her neck, back, and shoulder pain to him until November 2014.

Mrs. Toussaint testified that the automobile accident occurred "about a year" prior to trial; however, a settlement letter from State Farm regarding this automobile accident contains a February 17, 2016 Date of Loss.